******************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* RICHARD A. HOUGHTALING
## (SC 19510)

Rogers, C. J., and Palmer, Eveleigh, Espinosa, Robinson and D'Auria, Js.

*Syllabus*

Convicted, on a conditional plea of nolo contendere, of the crimes of possession of marijuana with the intent to sell and possession of more than four ounces of marijuana, the defendant appealed to the Appellate Court, claiming, inter alia, that the trial court improperly denied his motion to suppress certain evidence that the police seized from property he owned but leased to another individual, P, and his subsequent statement to the police. While conducting a marijuana eradication operation, the police observed numerous marijuana plants located on the property. During their search of the property, the police noticed two men, including P, inside a partially constructed greenhouse. After being administered *Miranda* warnings, P indicated to the police that he was leasing the property and gave the police consent to search it. Thereafter, the defendant, who was driving a van with another occupant, pulled into the driveway on the property, where unmarked police vehicles were parked, and then backed out very quickly and departed. After pursuing the van, the police questioned the defendant, handcuffed him, brought him and the other occupant back to the property, and gave them *Miranda* warnings. The defendant gave a statement to the police indicating that he had purchased the home the prior year, that he leased it to P and that he started helping P cultivate marijuana four to five months beforehand. The Appellate Court affirmed the judgment of conviction, concluding that the trial court properly denied the defendant's motion to suppress because he lacked a reasonable expectation of privacy in the property, the police were justified in stopping the defendant and conducting an inquiry as they had a reasonable and articulable suspicion that he had engaged in criminal conduct, and the police had probable cause to arrest him after they observed certain materials in the van similar to the materials being used to construct the greenhouse. On the granting of certification, the defendant appealed to this court. *Held*:

1. The Appellate Court correctly concluded that the defendant lacked standing to challenge the warrantless search of the property because he lacked a subjective expectation of privacy therein: the defendant presented no evidence establishing the frequency and nature of his visits to the property or whether he retained the right to exclude others from all or part of the property, or any evidence indicating that he stayed at the property or otherwise continually used the property after leasing it to P, and the only evidence that may have connected the defendant to the property was a few pieces of mail and one personal item on the property, which did not establish how often the defendant visited the property or the nature of his relationship therewith; moreover, the defendant could not prevail on his claim that he maintained a connection with the property by participating in P's marijuana grow operation, the defendant having failed to present sufficient evidence to establish the extent of his involvement with that operation.

2. The defendant could not prevail on his claim that his confession to the police was the fruit of the unlawful stop of the defendant in his van and his subsequent warrantless arrest: the police were justified in detaining the defendant to further inquire about his relationship to the property because they had a reasonable and articulable suspicion that the defendant was connected with the marijuana grow operation, as the police could have reasonably inferred from their experience and knowledge of the grow operation, and from the defendant's actions in light of the circumstances, that he was at least aware of, if not directly connected to, the activities occurring on the property; moreover, the defendant's interaction with the police after their stop of the van and the fact that the van contained, in the plain view of the police officers, materials resembling those used to build the greenhouse, which the officers had previously observed was under construction, were sufficient

to establish probable cause to believe that the defendant was involved with P's marijuana grow operation and, thus, provided a basis on which to arrest the defendant.

*State* v. *Boyd* (57 Conn. App. 176), to the extent that it requires a defendant, in order to establish a subjective expectation of privacy in property, to show facts sufficient to create the impression that his relationship with the location was personal in nature, and was more than sporadic, irregular or inconsequential, and that he maintained the location and items within it in a private manner at the time of the search, overruled.

Argued March 29—officially released July 25, 2017

*Procedural History*

Substitute information charging the defendant with the crimes of possession of marijuana with the intent to sell and possession of more than four ounces of marijuana, brought to the Superior Court in the judicial district of Windham, geographical area number eleven, where the court, *Riley, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the defendant was presented to the court on a conditional plea of nolo contendere; judgment of guilty, from which the defendant appealed to the Appellate Court, *Gruendel, Beach* and *Alvord, Js.*, which affirmed the judgment of the trial court, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Richard Emanuel*, with whom, on the brief, was *David V. DeRosa*, for the appellant (defendant).

*Nancy L. Walker*, deputy assistant state's attorney, with whom, on the brief, were *Anne Mahoney*, state's attorney, and *Matthew Crockett*, senior assistant state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. The primary issue in this certified appeal is whether the defendant, Richard Houghtaling, presented evidence sufficient to establish his subjective expectation of privacy in a residence he had leased to a third party. After the police found numerous marijuana plants during a search at the residence, the officers located and stopped the defendant and later arrested him. After his arrest, the defendant admitted he was aware of, and had provided some unspecified assistance with, the grow operation. The state later charged the defendant with certain drug related offenses. The defendant moved to suppress evidence gathered during the search and his subsequent statements to the police as the fruits of a warrantless and illegal search of the property, which he owned but had leased to a third party, Thomas Phravixay. He also claimed that the police had illegally stopped and arrested him. The trial court denied the defendant's motion, and he subsequently entered a conditional plea of nolo contendere. The Appellate Court affirmed the defendant's conviction; see *State* v. *Houghtaling*, 155 Conn. App. 794, 830, 111 A.3d 931 (2015); and we granted certification to appeal. *State* v. *Houghtaling*, 317 Conn. 919, 919–20, 118 A.3d 62 (2015). Because we agree with the Appellate Court that the defendant lacked standing to challenge the search, and that his detention and subsequent arrest were lawful, we affirm the judgment of the Appellate Court.

The record reveals the following facts relevant to this appeal. On August 9, 2010, the Statewide Narcotics Task Force (task force)—comprised of federal, state, and local law enforcement officers—was conducting a marijuana eradication operation in the northeast corner of the state. The operation was comprised of two spotters who were patrolling the area in a helicopter and a ground team consisting of several members. The task force had performed marijuana eradication missions earlier in the day, and, shortly after noon, the helicopter team notified the ground team of a suspected large crop of marijuana at 41 Raymond Schoolhouse Road in the town of Canterbury (property). From the air, the spotters were able to see dozens of marijuana plants within a fenced-in pool area behind the house, as well as several plants along the outside of the fence. The ground team arrived at the property approximately thirty minutes later in separate, undercover and unmarked vehicles, which bore no resemblance to police vehicles.

The property consisted of 5.6 acres and was largely surrounded by dense forest. The only means of ingress and egress was a narrow dirt driveway more than 100 feet long and lined with trees on both sides. There were signs marked "No Trespassing" posted on trees along the driveway, and, about halfway down the driveway, there was a metal gate that could block the driveway

but that was not closed. The ground team parked their vehicles in front of the gate, donned protective vests, which identified them as police officers, and proceeded to the front door of the house on foot. As the members of the ground team approached the home, they saw no occupant vehicles or persons, smelled nothing, and heard nothing. The officers knocked on the front door but received no answer.

The ground team then left the front door and proceeded toward the back door. The air team had told the ground team that, if they continued around the side of the house, they would see "a whole lot of marijuana right out in the open." Before reaching the back door, the officers saw a pool area with dozens of marijuana plants inside and additional plants surrounding the area. The officers then continued to search the property, including a greenhouse located behind the pool, near the rear of the property. As the police approached the greenhouse, they noticed it was still under construction. The ends of the structure had no side walls, and there were piles of lumber on the ground nearby. Inside the greenhouse, the police were able to see numerous marijuana plants and two men, one of whom was later identified as Phravixay.

Both of the men were given *Miranda*[1] warnings and agreed to answer questions. Phravixay told the officers he was renting the home and later gave the officers written consent to search the property. The search ultimately revealed more than 1000 marijuana plants.

While two members of the ground crew were returning to their vehicles to obtain an evidence kit, they noticed a white van pull into the driveway of the property, where the unmarked police vehicles were parked, and then reverse back into the street and depart "[v]ery quickly." The helicopter team also spotted the van enter the driveway and radioed the ground team to alert all of the officers concerning the van's presence. The officers were suspicious of the van, believing that its occupants might be involved in the marijuana grow operation, and decided to pursue the van. By the time the police got into a car, headed up the driveway after the van, and arrived out on the road, the van was already parked at the side of the road, approximately one tenth of one mile away, facing back toward the driveway.

The officers drove to the location where the van was parked, exited their vehicle, and approached the van. The officers had drawn their weapons for their safety because, as the trial court noted, those involved in drug dealing often possess firearms. The van was occupied by two males—the defendant was in the driver's seat and another person sat in the passenger seat. Upon determining that the occupants of the van posed no threat, the officers holstered their weapons and asked the defendant for identification. When the officers asked the defendant why he had pulled into the drive-

way and then left abruptly, he stated that he was going to visit a friend but left when he saw that the driveway was full of cars he did not recognize. As the trial court found, the defendant's answers to the officers' questions were evasive, and, although he claimed to be visiting a friend, he would not name the friend. While the police were questioning the defendant, they were able to observe from outside the van that it contained lumber and irrigation piping similar to that which was used to construct the greenhouse. The officers then handcuffed the defendant and the passenger, and brought them back to the property.

Upon arriving back at the property, the police advised the defendant of his *Miranda* rights. The defendant at first refused to speak with the police but then agreed to once the officers told him that Phravixay had consented to their search of the property, that they had found mail with the defendant's name on it in the house and in the mailbox, and that Phravixay had identified the defendant as the homeowner and the person who leased the property to him. The defendant told the officers he had purchased the home in the prior year but could not afford the mortgage payments, so, to help cover his expenses, he leased the property to Phravixay, whom he had known for several years. The defendant said Phravixay had paid rent only periodically, and the defendant had been helping Phravixay cultivate marijuana for the previous four or five months to "recoup some of [his] money." Although the defendant said he was helping with the cultivation, he stated that, "up until [that day, he] didn't realize the extent of the grow operation. I own my own business and didn't really think much of what was going on at the house . . . ."

The defendant initially was charged with numerous drug related offenses,[2] and he moved to suppress "(1) all evidence seized by law enforcement officers in connection with the warrantless search and seizure conducted at [the] property on August 9, 2010; (2) all statements made by [the defendant] and others, including . . . Phravixay, as a result of the illegal search and seizure; and (3) the fruits of any and all other evidence obtained, derived or developed as a result of the illegal search and seizure and illegally obtained statements . . . ." The defendant claimed that the court must suppress this evidence because the police had violated his fourth amendment rights when they failed to obtain a warrant before searching the property and when they detained him in his van, which he claims was done without reasonable suspicion that he had engaged in criminal activity.

At the hearing on the motion to suppress, the state called four police officers to testify about their actions and observations during the search and seizure. The defendant called no witnesses. After the witnesses had testified, the state argued that the defendant had failed

to establish his subjective expectation of privacy because all of his personal property was in the city of Danbury, where he lived with his wife and family, and the defendant had failed by any other conduct to demonstrate a subjective expectation of privacy in the property where the search occurred. Defense counsel responded by arguing that the defendant's ownership of the property alone was sufficient to establish standing. He argued that the state was trying to get around this fact by making a "hyper-technical argument on standing . . . ."

The trial court agreed with the state and denied the defendant's motion to suppress the evidence seized from the search of the property and the defendant's statements to the police. The trial court concluded that the defendant had failed to establish that he had a subjective expectation of privacy in the property. The court also found that the police possessed a reasonable and articulable suspicion sufficient to justify stopping the defendant's van after he entered and quickly exited the driveway. Lastly, the trial court concluded that the officers had probable cause to arrest the defendant. The defendant then entered a conditional plea of nolo contendere.[3]

The defendant appealed to the Appellate Court from the judgment of conviction, claiming that the trial court's denial of his motion to suppress was improper because "(1) he had a reasonable expectation of privacy in the area searched, including the home and the area surrounding it, (2) his fourth amendment rights were violated by the warrantless search conducted by the . . . task force, [and] (3) the police lacked a reasonable and articulable suspicion to conduct a motor vehicle stop of the van operated by the defendant, and his resulting arrest was unsupported by probable cause . . . ." (Footnote omitted.) *State* v. *Houghtaling*, supra, 155 Conn. App. 797. The Appellate Court rejected all of these claims. Id., 800, 808, 818, 823.

Specifically, the Appellate Court concluded that the defendant's first two claims failed because he lacked a reasonable expectation of privacy.[4] Id., 808. The Appellate Court determined that the defendant failed to establish his subjective expectation of privacy because he did not sufficiently develop his personal relationship with the property at the suppression hearing. See id., 803. The defendant argued that he was a cooccupant of the property and cited three facts to support this contention: (1) he leased the property to Phravixay for less than his monthly mortgage payment; (2) he received and stored items on the premises; and (3) he received some mail at the property. Id.

The Appellate Court determined that the fact that Phravixay's rent was less than the defendant's mortgage established nothing about the manner in which he retained rights to use the property, or if he retained

them at all. Id. Moreover, although the defendant claimed that he received and stored property on the premises, he identified only a single item of his at the property—an aeration system addressed to him at his Danbury residence. Id., 804. The court did not find that the presence of a single piece of property established that the defendant was a cotenant. See id. Finally, the Appellate Court concluded that the presence of " 'some mail' "; id.; did not establish that the defendant lived at the property or otherwise was there frequently. See id.

The Appellate Court also concluded that the police possessed a reasonable and articulable suspicion that the defendant had engaged in criminal conduct. Id., 818. The Appellate Court determined that, on the basis of the totality of the circumstances, including the spatial and temporal link between the *Terry*[5] stop and the investigation of the felony in progress (the marijuana grow operation), as well as the defendant's act of entering and quickly leaving the property, the police were justified in stopping the defendant. Id., 813–16, 818. The Appellate Court also determined that the police had probable cause to arrest the defendant after they observed lumber and irrigation piping in the van similar to the materials being used to construct the greenhouse, demonstrating a probable connection between the defendant and the marijuana operation at the property. Id., 821–23.

The defendant appealed to this court from the judgment of the Appellate Court, and we granted certification on the following issues: (1) "Did the Appellate Court properly determine that the defendant did not have standing (a reasonable expectation of privacy) to challenge a search of residential premises that he owned but had leased at the time of the search?" *State v. Houghtaling*, supra, 317 Conn. 920. (2) "If the answer to the first question is in the negative, were all subsequent actions of the police—the *Terry* stop of the vehicle, the warrantless arrest, and the defendant's confession—the fruits of one or more preceding illegalities?" Id. (3) "If the answer to the first question is in the affirmative, did the Appellate Court properly determine that the *Terry* stop and warrantless arrest of the defendant were lawful, and that the resulting confession was lawfully obtained?" Id. We answer the first question in the affirmative, do not reach the second question, and answer the third question in the affirmative. We thus affirm the judgment of the Appellate Court.

When reviewing a trial court's denial of a motion to suppress, "[a] finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the

trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the [trial court's] memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Kendrick*, 314 Conn. 212, 222, 100 A.3d 821 (2014). Accordingly, although we must defer to the trial court's factual findings, determining whether those findings establish standing is a question of law, over which we exercise plenary review. See, e.g., *State* v. *Gonzalez*, 278 Conn. 341, 348, 898 A.2d 149 (2006).

I

The defendant first claims that the Appellate Court incorrectly determined that he lacked standing to challenge the warrantless search of the property because he lacked a subjective expectation of privacy therein. We disagree.

A

The fourth amendment to the United States constitution protects individuals from unreasonable searches and seizures.[6] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. The rights guaranteed by the fourth amendment are personal rights, and, therefore, only one " 'whose own protection was infringed by a search and seizure' " may enforce those rights. *Rakas* v. *Illinois*, 439 U.S. 128, 138, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). To challenge a search as unreasonable, a defendant must have standing. To establish standing, a defendant must show that he possesses a reasonable expectation of privacy in the area searched. See, e.g., *State* v. *Boyd*, 295 Conn. 707, 718, 992 A.2d 1071 (2010), cert. denied, 562 U.S. 1224, 131 S. Ct. 1474, 179 L. Ed. 2d 314 (2011).

To determine whether a person has a reasonable expectation of privacy in an invaded place or seized effect, that person must satisfy the *Katz* test. See *Katz* v. *United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring). The *Katz* test has both a subjective and an objective prong: "(1) whether the [person contesting the search] manifested a subjective expectation of privacy with respect to [the invaded premises or seized property]; and (2) whether that expectation [is] one that society would consider reasonable. . . . This determination is made on a case-by-case basis. . . . The burden of proving the exis-

tence of a reasonable expectation of privacy rests [with] the defendant." (Internal quotation marks omitted.) *State* v. *Jackson*, 304 Conn. 383, 395, 40 A.3d 290 (2012).

In analyzing the subjective prong of the *Katz* test, we look for actions or conduct demonstrating that the defendant sought to preserve the property or location as private. See, e.g., *Smith* v. *Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979); see also *State* v. *Boyd*, 57 Conn. App. 176, 185, 749 A.2d 637 ("a subjective expectation of privacy rests on finding conduct [through which a defendant] has demonstrated an intention to keep activities or things private and free from knowing exposure to others' view"), cert. denied, 253 Conn. 912, 754 A.2d 162 (2000). Although this prong is the "subjective" portion of the test, it does not rest solely on the defendant's actual beliefs. See *Smith* v. *Maryland*, supra, 741 n.5 (stating that, in some cases, normative inquiry rather than subjective expectations inquiry is proper); O. Kerr, "*Katz* Has Only One Step: The Irrelevance of Subjective Expectations," 82 U. Chi. L. Rev. 113, 114–15 (2015) (the subjective prong of *Katz* test was originally more akin to question of waiver— meant to summarize precedents on exposure to third parties—rather than question regarding defendant's actual belief). "The first part of the *Katz* test requires only . . . [a person's] conduct [to] have demonstrated an intention to keep activities and [property] . . . private, and that he did not knowingly expose [it] to the open view of the public." (Internal quotation marks omitted.) 1 W. LaFave, Search and Seizure (5th Ed. 2012) § 2.1 (c), p. 585; see also *United States* v. *Taborda*, 635 F.2d 131, 137 (2d Cir. 1980).

The trial court found that the defendant had failed to establish a subjective expectation of privacy in the property but also concluded that, even if he did, it was not one that society would recognize as reasonable. The Appellate Court determined that the defendant lacked a subjective expectation of privacy and therefore did not examine the objective prong of the *Katz* test. See *State* v. *Houghtaling*, supra, 155 Conn. App. 807–808.

To evaluate whether the defendant met his burden of establishing a subjective expectation of privacy, the Appellate Court relied on the three factor test set in *Boyd*. See id., 802–808. Specifically, the court in *Boyd* declared that a defendant "must show facts sufficient to create the impression that (1) his relationship with the location was personal in nature, (2) his relationship with the location was more than sporadic, irregular or inconsequential, and (3) he maintained the location and the items within it in a private manner at the time of the search." *State* v. *Boyd*, supra, 57 Conn. App. 185.

We have not recently had occasion to review a decision that turns solely on the first, subjective prong of the *Katz* test, and specifically have not had occasion to consider whether the factors discussed in *Boyd*

appropriately measure a particular defendant's subjective expectation of privacy. Although we agree with the Appellate Court's ultimate conclusion, upon reviewing these factors, and understanding that the Appellate Court panel appropriately considered itself bound by its own precedent in *Boyd*, we disagree with *Boyd*'s three factor test as articulated and thus overrule *Boyd* to the extent that it requires a defendant to meet its three factor test to establish his or her subjective expectation of privacy. We take this occasion to clarify the proper method of evaluating a defendant's subjective expectation of privacy.[7]

This court has not previously adopted a rigid test for determining a subjective expectation of privacy, and we decline to do so now. See, e.g., *State* v. *Davis*, 283 Conn. 280, 324, 929 A.2d 278 (2007) ("the [reasonable expectation of privacy] test offers no exact template that can be mechanically imposed upon a set of facts to determine whether . . . standing is warranted" [internal quotation marks omitted]); cf. O. Kerr, "Four Models of Fourth Amendment Protection," 60 Stan. L. Rev. 503, 506 (2007) ("[t]he [United States] Supreme Court has not and cannot adopt a single test for when an expectation is 'reasonable' because no one test effectively and consistently distinguishes the more troublesome police practices that require [f]ourth [a]mendment scrutiny from the less troublesome practices that do not").

Our continuing decision not to adopt a rigid test for determining a defendant's subjective expectation of privacy stems from the fact that the *Boyd* factors are unsupported by relevant precedent. The court in *Boyd* cited *United States* v. *Gerena*, 662 F. Supp. 1218, 1235 (D. Conn. 1987), as support for its three factor test.[8] *State* v. *Boyd*, supra, 57 Conn. App. 185. In *Gerena*, the District Court began by articulating a generalized requirement for establishing a subjective expectation of privacy: "The defendant must show that he or she personally sought to preserve the particular location, and its contents, as private." *United States* v. *Gerena*, supra, 1234. The District Court then went on to describe what would become the *Boyd* factors: "A defendant satisfies [the subjective] prong of the test by alleging facts sufficient to create the impression that his or her relationship with the location was personal in nature; was more than sporadic, irregular, or inconsequential; and that the defendant maintained the location and the items within it in a private manner at the time of the search." Id., 1235. The District Court cited no precedent to support the use of these factors, let alone a reason why they would apply in every case. See generally id. Rather, that court appears to have been articulating a series of factors that were relevant in that particular case, providing no reason to apply these factors outside of *Gerena*.[9]

In addition to not truly reflecting an analysis grounded in United States Supreme Court precedent, we note several problems with the *Boyd* test. First, it is written in the conjunctive, requiring that a defendant satisfy all three prongs of the test to establish standing. A defendant might fail to satisfy one of the prongs of the test, even though he possesses a subjective expectation of privacy that is well recognized as reasonable. Also, the first two prongs of the *Boyd* test are particularly problematic.

For example, the first *Boyd* factor requires the defendant to establish that "his relationship with the location was personal in nature . . . ." *State* v. *Boyd*, supra, 57 Conn. App. 185. Although fourth amendment rights are personal in nature; see, e.g., *Rakas* v. *Illinois*, supra, 439 U.S. 138; because the word "personal" is susceptible to multiple meanings, *Boyd*'s requirement that the defendant's relationship with the location be personal in nature is problematic. For example, Black's Law Dictionary defines personal as "[o]f or affecting a person," and "[o]f or constituting personal property . . . ." Black's Law Dictionary (10th Ed. 2014) p. 1325. The first definition is overinclusive because defendants would likely not seek to exclude evidence that has no bearing on their case, and, therefore, any evidence sought to be suppressed would be "affecting a person . . . ." Id. The second definition is underinclusive because an illegal search need not have involved the defendant's personal property for the defendant to possess a privacy interest. "[P]roperty rights are neither the beginning nor the end of [the] [c]ourt's inquiry into whether a defendant's [reasonable expectation of privacy has] been violated by an illegal search." (Internal quotation marks omitted.) *State* v. *Davis*, supra, 283 Conn. 309.[10] Additionally, this definition could exclude commercial property, even though this court has held that a defendant can have a reasonable expectation of privacy in such property. See *State* v. *Zindros*, 189 Conn. 228, 229, 240–42, 456 A.2d 288 (1983) (holding that commercial tenant possessed reasonable expectation of privacy in space he had leased to use as restaurant), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984).

The second prong of the *Boyd* test also presents problems. That prong requires a defendant to show that "his relationship with the location was more than sporadic, irregular or inconsequential . . . ." *State* v. *Boyd*, supra, 57 Conn. App. 185. The case law of this state—as well as multiple federal cases—recognizes several situations in which a defendant possesses a reasonable expectation of privacy but in which that same defendant would fail the subjective expectation of privacy test under this second prong of *Boyd*. For example, under *Boyd*, a person who travels to a new city, rents a hotel room, drops off her bag in the room and leaves for several days on an excursion could be

said to have a relationship with that room that is sporadic and irregular. Concluding that this relationship was insufficient under *Boyd*, however, would be clearly contrary to our case law establishing that a person who rents a hotel room generally has a reasonable expectation of privacy in that room, as long as he or she intends to return to it. Cf. *State* v. *Jackson*, supra, 304 Conn. 396–98 (defendant had no expectation of privacy in hotel room or in personal effects therein when he left room with no intent to return). The *Boyd* test could also fail to recognize an overnight guest's subjective expectation of privacy; see *Minnesota* v. *Carter*, 525 U.S. 83, 89, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998); because that guest's presence might be sporadic, irregular, and inconsequential.

The third prong of *Boyd* also suffers from deficiencies. It requires that the defendant have "maintained the location and the items within it in a private manner at the time of the search." *State* v. *Boyd*, supra, 57 Conn. App. 185. Although less problematic than the other two prongs, the third prong can also fail to recognize a reasonable expectation of privacy when one exists. For example, in *United States* v. *Vega*, 221 F.3d 789 (5th Cir. 2000), cert. denied sub nom. *Ramon Vega* v. *United States*, 531 U.S. 1155, 121 S. Ct. 1105, 148 L. Ed. 2d 975 (2001), the police surrounded a home looking for evidence of drug trafficking. See id., 794. When the defendants noticed the police, one defendant ran out through the back door, leaving it open. See id. The government argued that, because the door was left open, the house was exposed to public view and lost its fourth amendment protection. See id., 796. Although the court rejected the government's contention; id.; if it had applied the third factor of *Boyd*, its fourth amendment analysis could have led to the opposite result.

For these reasons, we decline to adopt the *Boyd* test. Although the factors enumerated in *Boyd* might, in a particular case, be relevant to a court's analysis, they should not serve as an inflexible yardstick by which the privacy interests of all criminal defendants are measured. Instead, we reaffirm that courts should properly test a defendant's subjective expectations by looking for conduct demonstrating an intent " 'to preserve [something] as private,' " and free from knowing exposure to the view of others. *Bond* v. *United States*, 529 U.S. 334, 338, 120 S. Ct. 1462, 146 L. Ed. 2d 365 (2000). [11]

B

At the hearing on the motion to suppress, the defendant failed to adduce sufficient evidence to establish his intent to keep the property private and free from knowing exposure to the view of others. Although the defendant did establish that he owned the property, he told the police he could not afford the payments and had leased the house to Phravixay for months. At the suppression hearing, the defendant did not present a

written lease or offer any testimony regarding the provisions of the lease. Nor did he present sufficient evidence that he maintained frequent contact with the property, retained the right to exclude others or engaged in other significant contact with the property.

When, as in the present case, a property owner has leased that property to another person, the owner generally loses any expectation of privacy in the property. A landlord is generally much less likely to possess a reasonable expectation of privacy than an owner-occupant. This is because, upon leasing the property, he generally cedes control to the tenant, who can invite others onto the property, potentially exposing his activities or contraband to them. See, e.g., *United States* v. *Rios*, 611 F.2d 1335, 1345 (10th Cir. 1979) (holding that defendant's "bare legal ownership" would not suffice to establish standing absent "any indication that he used the . . . home in such a way as to raise a legitimate expectation of privacy"). "[I]f the owner of certain premises has leased them to another *without reserving any right of possession* to himself, then it cannot be said that a police intrusion into those premises encroaches upon his expectation of privacy." (Emphasis added.) 6 W. LaFave, supra, § 11.3 (a), p. 170.

If, however, the owner maintains a regular presence at the property, retains the right to exclude others from the property or otherwise exercises significant control over the property, the owner might still possess a reasonable expectation of privacy. For example, in *State* v. *Suco*, 521 So. 2d 1100 (Fla. 1988), the Florida Supreme Court held that a landlord who leased a single family dwelling had standing when he retained a key to enter for purposes of collecting rent, maintaining the premises, and making repairs, and regularly went to the house, let himself in without announcing his presence, and watched television with the tenant's family. Id., 1101–1102. Similarly, in *State* v. *Casas*, 900 A.2d 1120 (R.I. 2006), a defendant had a reasonable expectation of privacy in the basement of an apartment building owned by his wife because he collected rents, made repairs and prohibited tenants from entering the basement area, over which he retained control. Id., 1130.

In the present case, although it might have been possible for the defendant to establish standing, he presented no evidence establishing the frequency and nature of his visits to the property, or whether he retained a right to exclude others from any or all of the property. Nor did he produce any evidence indicating that he stayed at the property or otherwise continuously used the property after leasing it to Phravixay. He established nothing but bare legal ownership. See *United States* v. *Rios*, supra, 611 F.2d 1345.

The only other evidence perhaps connecting the defendant to the property consisted of a few pieces of mail and an aeration system addressed to the defendant

at his Danbury residence. None of these items, however, established how often the defendant visited the property or the nature of his relationship to the property, and thus did not sufficiently establish his subjective expectation of privacy. The defendant did not submit the mail into evidence or even identify what type of mail it was. As anyone who has ever changed residences knows, a previous occupant's mail might continue to arrive for months, if not years, after that person has moved. Without knowing the nature or the volume of the correspondence, we cannot assume that it was significant or anything other than junk mail. Additionally, no evidence was offered about whether or how often the defendant went to the property to retrieve the mail. Similarly, the mere presence of a single piece of property addressed to the defendant tells us nothing meaningful about how the defendant used the property. The defendant offered no evidence about how the aeration system ended up at the property, or whether it was ever used. Phravixay or a confederate could have driven to the defendant's home in Danbury to pick up the item and deliver it to the property in Canterbury. Without any testimony to establish how much property the defendant purchased, or how it made its way from Danbury to Canterbury, the presence of a single aeration system cannot establish the defendant's subjective expectation of privacy in the property. Furthermore, leaving a single piece of personal property establishes nothing about the frequency of the defendant's visits to the property or the level of his involvement in the grow operation.

The defendant argues that he nevertheless had a reasonable expectation of privacy because he maintained a connection with the property by participating in the marijuana grow operation. We disagree. Even if a defendant could establish a subjective expectation of privacy through his participation in a criminal conspiracy,[12] the defendant still has not met his burden.[13] The defendant did not present sufficient evidence at the hearing to establish what his involvement with the marijuana cultivation actually was. Although he cites his statement to the police that, "about [four] to [five] months ago I began to help [Phravixay] cultivate the marijuana," the defendant offers no evidence of what his "help" entailed or how that "help" manifested a privacy interest in the property.

Also, the defendant's own statements to the police suggest that his presence at the property was more limited than he would now have us believe. When he was arrested, the defendant told the police: "[u]p until today I didn't realize the extent of the grow operation." This statement indicates that the defendant's involvement with the grow operation could not have been extensive, further diminishing any significance of the mail and aeration system, because even a brief visit and cursory view of the property would have revealed an

extremely large grow operation containing more than 1000 plants, hundreds of which were inside the house.

Thus, the defendant has simply failed to establish a subjective expectation of privacy. At the suppression hearing, the defendant challenged the constitutionality of the warrantless search solely on the basis of his ownership of the property. As a result, the defendant did not present sufficient evidence detailing his connection to the property or the grow operation that took place there, if such evidence existed at all. Because the defendant has failed to adduce any evidence that he maintained a regular presence, was an overnight guest, retained the right to exclude others, or had any other significant connection to the property, he has failed to establish a reasonable expectation of privacy. Under the facts presented, the defendant "could not legitimately expect that the [property] . . . would remain secure from prying eyes, irrespective of whether those eyes were private or governmental." *United States* v. *Ramapuram*, 632 F.2d 1149, 1156 (4th Cir. 1980), cert. denied, 450 U.S. 1030, 101 S. Ct. 1739, 68 L. Ed. 2d 225 (1981). As such, we have no occasion to address the defendant's claim that the officers were not justified in entering the property without a warrant.

II

The defendant next claims that, even if he lacked standing to challenge the warrantless search of the property, his confession to the police was the unlawful fruit of the *Terry* stop and warrantless arrest. We disagree and uphold the trial court's conclusion that the police possessed a reasonable and articulable suspicion to stop the defendant and, later, had probable cause to arrest him.

A

The law in this area is well settled. "A stop pursuant to *Terry* v. *Ohio*, [392 U.S. 1, 21–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)], is legal if three conditions are met: (1) the officer must have a reasonable suspicion that a crime has occurred, is occurring, or is about to occur; (2) the purpose of the stop must be reasonable; and (3) the scope and character of the detention must be reasonable when considered in light of its purpose. . . . The United States Supreme Court has further defined reasonable suspicion for a traffic stop as requiring some minimal level of objective justification for making the stop. . . . Because a reasonable and articulable suspicion is an objective standard, we focus not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion." (Citations omitted; internal quotation marks omitted.) *State* v. *Cyrus*, 297 Conn. 829, 837, 1 A.3d 59 (2010). What constitutes a reasonable and articulable suspicion depends on the totality of the

circumstances. See, e.g., *State* v. *Lipscomb*, 258 Conn. 68, 77, 779 A.2d 88 (2001). "Moreover, [w]e do not consider whether the defendant's conduct possibly was consistent with innocent activity . . . ." (Internal quotation marks omitted.) *State* v. *Peterson*, 320 Conn. 720, 733, 135 A.3d 686 (2016).

"On appeal, [t]he determination of whether a reasonable and articulable suspicion exists rests on a two part analysis: (1) whether the underlying factual findings of the trial court are clearly erroneous; and (2) whether the conclusion that those facts gave rise to such a suspicion is legally correct." (Internal quotation marks omitted.) *State* v. *Cyrus*, supra, 297 Conn. 837–38.

Several facts known to the officers establish that they were justified in detaining the defendant to further investigate his presence on and rapid departure from the property. First, the trial court credited the officers' testimony that someone entering the property might be involved in the grow operation. "While it is well settled that an individual's mere presence at a location known for criminal activity is not sufficient, without more, to support a reasonable suspicion . . . the individual's presence in such a location can be a relevant articulable fact in the *Terry* reasonable suspicion calculus." (Citations omitted.) *State* v. *Peterson*, supra, 320 Conn. 734. In the present case, the record demonstrates that the defendant was not stopped simply because he was in the wrong place at the wrong time. The defendant was not just passing through a high crime area. Rather, he entered a remote property containing a very large and sophisticated marijuana grow operation and rapidly exited the driveway—an action that the police could have reasonably inferred the defendant took in response to seeing an unfamiliar and unexpected sight. He then drove a short distance down the road and turned around, parking the van facing back toward the property. The officers' experience and their knowledge of the ongoing grow operation could have reasonably led them to infer that the defendant was at least aware of, if not directly connected to, the activities occurring on the property. This gave the officers a reasonable and articulable suspicion sufficient for them to briefly detain the defendant and inquire about his relationship to the property.

The defendant contends that the only reason he was stopped was that he pulled his van into the driveway and quickly exited.[14] The defendant, however, overlooks several of the trial court's findings. First, the defendant did not simply enter an empty driveway and turn around; he entered a driveway that led to a huge marijuana grow operation. That driveway was filled with cars he could not have recognized.[15] Upon arriving on the scene and pulling in behind vehicles unfamiliar to him, the defendant rapidly exited the driveway. The defendant concedes that the property is rural and iso-

lated. This makes it less likely that the defendant coincidentally pulled into this particular driveway to turn around, particularly when considering that he drove down the road approximately one tenth of one mile before *turning around* and parking the van on the side of the road, facing toward the property. We agree with the trial court that these facts provided the officers with a reasonable and articulable suspicion that the defendant was somehow connected to the grow operation.

### B

The defendant also claims that his arrest following the *Terry* stop was not supported by probable cause. We conclude that it was. "Probable cause, broadly defined, comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred." (Internal quotation marks omitted.) *State* v. *Johnson*, 286 Conn. 427, 435, 944 A.2d 297, cert. denied, 555 U.S. 883, 129 S. Ct. 236, 172 L. Ed. 2d 144 (2008). "The quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction. Our cases have made clear that [t]here is often a fine line between mere suspicion and probable cause, and [t]hat line necessarily must be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances. . . . Furthermore, when we test the quantum of evidence supporting probable cause, it is not the personal knowledge of the arresting officer but the collective knowledge of the law enforcement organization at the time of the arrest [that] must be considered." (Citations omitted; internal quotation marks omitted.) *State* v. *Dennis*, 189 Conn. 429, 431–32, 456 A.2d 333 (1983).

Applying these principles to the present case, we conclude that the facts known to the officers gave them probable cause to arrest the defendant. When the officers had initially approached the defendant, they asked him for his license and registration, and the reason for his presence at the home. The officers later testified that the defendant's answers were evasive and that he would not name the friend he was allegedly there to visit; the trial court credited this testimony. This interaction occurred immediately after the defendant had driven the van directly to, but departed "[v]ery quickly" from, the property, which was the site of a massive marijuana grow operation. Additionally, the trial court credited an officer's testimony that the van contained, in plain view of the officers, lumber and irrigation piping resembling the materials used in the greenhouse, which task force members observed was under construction. The presence of these materials and the attendant circumstances were sufficient to establish probable cause to believe that the defendant was involved with the

grow operation, giving them grounds to arrest the defendant.[16]

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[1] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] The defendant initially was charged with the production and preparation of a controlled substance without a license, possession of more than four ounces of marijuana, the sale of illegal drugs, and the operation of a drug factory.

[3] The defendant pleaded guilty to possession of marijuana with the intent to sell, and possession of more than four ounces of marijuana.

[4] The Appellate Court relied on the three part test set forth in *State* v. *Boyd*, 57 Conn. App. 176, 185, 749 A.2d 637, cert denied, 253 Conn. 912, 754 A.2d 162 (2000). See *State* v. *Houghtaling*, supra, 155 Conn. App. 802–808. Although we agree with the Appellate Court's ultimate conclusion, we conclude that the factors the court in *Boyd* considered do not properly measure a defendant's subjective expectation of privacy. See part I B of this opinion.

[5] *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[6] "The fourth amendment's protection against unreasonable searches and seizures is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961)." *State* v. *Kelly*, 313 Conn. 1, 8 n.3, 95 A.3d 1081 (2014).

[7] We note that *Boyd*'s three factor test has been employed in only five Connecticut cases. In fact, only this case was decided solely on the basis of the subjective prong of the *Katz* test. See *State* v. *Houghtaling*, supra, 155 Conn. App. 802–808. The courts in all of the other cases either relied on the objective prong only, or on both the subjective and objective prongs of the *Katz* test, to reject the defendants' claims. See *State* v. *Braswell*, 145 Conn. App. 617, 642, 76 A.3d 231 (2013) (no objectively reasonable expectation of privacy), aff'd, 318 Conn. 815, 123 A.3d 835 (2015); *State* v. *Pierre*, 139 Conn. App. 116, 128 and n.7, 54 A.3d 1060 (2012) (same), aff'd, 311 Conn. 507, 88 A.3d 489 (2014); *State* v. *Lester*, Superior Court, judicial district of Litchfield, Docket No. CR-09-131899 (January 19, 2011) (no subjective or objective expectation of privacy); *State* v. *Kelly*, Superior Court, judicial district of Ansonia-Milford, Docket No. CR-06-61742 (January 8, 2009) (same).

[8] The court also cited *State* v. *Mooney*, 218 Conn. 85, 96–97, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991), in support of its three factor test. *State* v. *Boyd*, supra, 57 Conn. App. 185. *Mooney*, however, dealt with the objective prong of the *Katz* test, not the subjective prong, and specifically disavowed mechanistic tests to determine whether a defendant had a legitimate expectation of privacy. See *State* v. *Mooney*, supra, 97.

[9] Only two cases cite to this standard, namely, *United States* v. *Abreu*, 730 F. Supp. 1018, 1026 (D. Colo. 1990), aff'd, 935 F.2d 1130 (10th Cir.), cert. denied, 502 U.S. 897, 112 S. Ct. 271, 116 L. Ed. 2d 224 (1991), and *Boyd*.

[10] We note that property rights may be the beginning and the end of a fourth amendment analysis when the police have physically intruded on a person's residence. See *Florida* v. *Jardines*, U.S. , 133 S. Ct. 1409, 1417, 185 L. Ed. 2d 495 (2013). In the present case, however, the defendant has presented no evidence that he resided at the property where the search occurred.

[11] We note that, before announcing the three pronged test, the court in *Boyd* identified the proper standard for evaluating a defendant's subjective expectation of privacy: "A subjective expectation of privacy rests on finding conduct that has demonstrated an intention to keep activities or things private and free from knowing exposure to others' view." *State* v. *Boyd*, supra, 57 Conn. App. 185. Additionally, the trial court in the present case did not rely on *Boyd*'s three factor test but, instead, used a test substantially similar to the one we reaffirm today. Applying the latter test, the trial court concluded at the suppression hearing that the defendant did not present evidence establishing his subjective expectation of privacy.

[12] Because the defendant has not presented any facts establishing the extent of his participation in the marijuana grow operation, we leave this question for another day.

[13] The defendant cites numerous cases, including *United States* v. *Vega*, supra, 221 F.3d 789, and *United States* v. *Washington*, 573 F.3d 279 (6th

Cir. 2009), to support his contention that his use of the property to cultivate marijuana established standing. The defendant misreads these cases. In *Vega*, the Fifth Circuit Court of Appeals concluded that the defendant possessed an expectation of privacy in the property where he resided *despite* his use of the property for illegal purposes, not *because* he used the property for illegal activities. See *United States* v. *Vega*, supra, 797. Likewise, in *Washington*, the court held that the defendant's criminal activity did not eliminate his reasonable expectation of privacy, which derived from his status as an overnight guest in the apartment. See *United States* v. *Washington*, supra, 283–84. In both of these cases, therefore, independent bases supported the defendant's standing; it did not derive from the criminal activity itself. The defendant in the present case has not established an independent basis for his claim of standing.

[14] The defendant challenges only one of the trial court's factual findings. Specifically, he claims that it was unreasonable for the trial court to conclude that the defendant was fleeing from the police because there is no evidence to support an inference that the defendant ever saw the police or was otherwise aware that the vehicles on the property belonged to law enforcement. We need not resolve this issue because we find that, even if the defendant was not fleeing from the police, the police possessed a reasonable and articulable suspicion and thus were justified in stopping the defendant.

[15] Sergeant Douglas Hall of the task force testified that the officers were driving undercover vehicles with "no resemblance to police vehicles."

[16] The defendant also argues that his statement to the police, made subsequent to his arrest, should be suppressed. His arguments are all premised on his contention that the search of the property and the *Terry* stop were illegal, and that the officers lacked probable cause to arrest him. Because we conclude that (1) the defendant is without standing to challenge the search, (2) the *Terry* stop was legal, and (3) the officers had probable cause to arrest him, we are left with no other circumstances that would support a finding that his statement was involuntary.

———————————————————