******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

KAHN, J., with whom ROBINSON, C. J., joins, concurring. I agree with and join the judgment of the well reasoned majority opinion reversing the judgment of conviction of the defendant, Jean Jacques. That is, given the absence in the current record of any evidence or argument regarding the effect of the defendant's parole status on his expectation of privacy in his apartment, I agree that we are compelled to conclude that the trial court improperly denied the defendant's motion to suppress evidence obtained during a warrantless search of his apartment. Moreover, in light of the state's waiver of the claim that any error by the trial court was harmless, we are also compelled to reverse the judgment of conviction. I write separately to clarify two points: First, in my view, the state's case, even without the evidence obtained from the July 15, 2015 search of the defendant's apartment, was a strong one. My review of the record persuades me that the state would have readily been able to demonstrate that any error was harmless beyond a reasonable doubt. Second, and more importantly, I write to emphasize that a parolee's expectation of privacy in his or her dwelling does not increase upon being arrested and incarcerated for another offense during the period of parole.

I

HARMLESS ERROR

Before I proceed to the primary point I wish to make in this concurring opinion—that the defendant's expectation of privacy in his apartment did not increase as a result of his incarceration—I observe that, even without the evidence obtained from the July 15, 2015 search that is at issue in this appeal, the state had an overwhelming case against the defendant. The state's theory of the case was that the defendant went to the victim's apartment on the night of June 14, 2015, stabbed her to death, and then stole the crack cocaine and marijuana that the victim had on the premises, with the intent to sell the stolen drugs.

The state's evidence that the defendant had been in the victim's apartment and murdered her was compelling, even without the victim's cell phone and the drugs. Most significantly, the state presented evidence that the defendant's blood was on the victim's living room floor and on her kitchen wall. The state also presented the testimony of the victim's boyfriend, Jean Joseph, that, at approximately 11:20 p.m. on June 14, 2015, the victim texted him to tell him that the defendant was at her apartment. Joseph testified that, after receiving the victim's text, he unsuccessfully tried to call the defendant, but that the defendant immediately returned his call, confirmed that he was at the victim's apartment and

asked whether Joseph would be coming there that night. The cell phone records of both Joseph and the victim, produced by Verizon Wireless' Law Enforcement Resource Team, confirmed Joseph's testimony as to the substance of the victim's text, and the fact that Joseph spoke to the defendant immediately after receiving that text. The jury also viewed the redacted videotaped recording of the defendant's June 25, 2015 interview with Detective Anthony Gomes of the Norwich Police Department (department), who was the lead detective for the case. During that interview, although he denied entering her apartment, the defendant admitted that, on the night of June 14, 2015, he was outside the victim's building.

The state also produced strong evidence that the defendant stabbed the victim to death. The presence of his blood on her living room floor was certainly relevant to that question. When the defendant was arrested for selling crack cocaine on the afternoon of June 15, 2015, his clothing, including the sneakers that he was wearing, was seized. Testing revealed the victim's blood on the defendant's right sneaker. The state also produced the defendant's gym bag, which the police officers recovered from the trunk of a vehicle belonging to the defendant's friend, Indira Barros-Gomes, who had picked the defendant up at a laundromat on June 15, 2015. Inside the gym bag, the officers found a pair of the defendant's jeans, which, when tested, revealed the presence of the victim's blood.

The state produced evidence that the defendant suffered injuries during the commission of the murder. At the time of the defendant's arrest, the officers took photographs of the defendant's hands, revealing that he had bandages on both hands, covering multiple cuts. During their first search of his apartment, which the defendant does not challenge on appeal, the police found his blood in the apartment. Jeffrey Payette, a detective with the Connecticut State Police, testified that, ordinarily, they take samples of items that are deemed to have evidentiary value, but, because "there was just so much blood around the entire apartment," they decided to simply take representative samples. Testing later confirmed that the blood in his apartment was the defendant's.

The state presented the testimony of Tywan Jenkins, who was the defendant's cellmate at the Corrigan-Radgowski Correctional Center in Uncasville. While they were incarcerated together, the defendant gave Jenkins several accounts related to the victim's murder. In his final version of the events, the defendant told Jenkins that he stabbed the victim and that he cut himself during the attack. He also told Jenkins that, after he had killed the victim, he used a mop and bucket with bleach to clean the crime scene. It is worth noting that when the victim's body was discovered, a mop in a bucket with

bleach had been left out in the kitchen, consistent with Jenkins' testimony.

Finally, the state produced the following evidence to prove that, after the defendant had murdered the victim, he stole drugs from her apartment. Jenkins testified that the defendant had told him exactly that, confiding in Jenkins that he removed crack cocaine and the victim's cell phone from the apartment. Additional evidence corroborated Jenkins' account. The evidence established that, at the time of the murder, the victim had both crack and marijuana in her home. Joseph testified that he stored crack cocaine in a blue, nondairy creamer container in the victim's kitchen. He also testified that, during the afternoon of June 14, 2015, he and the victim purchased one-quarter pound of marijuana in Mystic, brought it back to the victim's apartment and smoked some of it while they watched television, including "Game of Thrones." When they had finished watching "Game of Thrones," sometime between 10 and 10:30 p.m., Joseph left, in order to go to the home of Johane Jean-Baptiste, the mother of his child.

By the next morning, both the crack and the marijuana had been removed from the victim's apartment. Joseph testified that he had a medical appointment on the morning of June 15, 2015, and that he went to the victim's home immediately thereafter. Upon entering, he immediately noticed that the victim's apartment, which ordinarily was very neat and had been so when he left the night before, was in disarray, and there was a mop and bucket left out in the kitchen. A table had been moved, the cushions on the sofa had been disturbed, kitchen cabinets were left open and items that had been removed from the cabinets were strewn over the counter. In particular, the container of nondairy creamer in which Joseph stored crack had been removed from the kitchen cabinet and left on the counter. When he eventually checked, he noticed that neither the crack nor the marijuana was in the apartment.

The state also produced evidence that the defendant, who had reported to a prospective buyer the previous week that he did not have any drugs to sell, was selling crack on the very day that the victim had been murdered. Specifically, Officer Nathaniel Tondreau of the department, testified that, on June 15, 2015, he reported to the scene of the murder when he heard the dispatch. Tondreau and his partner brought Joseph to the station to interview him. During the course of the interview, Joseph told them that the last text he received from the victim was that "Zo is here."[1] Tondreau testified that the name "Zo" caught his attention because he and his partner had attempted to use a confidential informant during the preceding week to purchase crack cocaine from a person named Zo. The confidential informant successfully contacted Zo, who was unable to sell

any crack because he did not have any drugs. On the basis of their belief that Zo and the defendant were the same person, Tondreau and his partner instructed the confidential informant to attempt to set up a purchase from Zo on the afternoon of June 15, 2015. The informant contacted Zo, who agreed to sell him $40 of crack cocaine. Tondreau and a team accompanied the informant to the arranged meeting place, where they observed the defendant exchange something with the informant, who returned to them and handed Tondreau a bag of crack cocaine. The officers then arrested the defendant.

In summary, the state produced evidence that, shortly before she was murdered, the victim told Joseph that the defendant was at her apartment. The defendant's blood was at the scene of the crime. He had cuts on his hands and his blood was all over his apartment. He had the victim's blood on his sneakers and on his jeans, which were discovered in his gym bag in the trunk of a friend's vehicle. He told his cellmate that he killed the victim and that he took the crack from her apartment. The police, who had information that the defendant had no drugs to sell the week before, monitored their confidential informant's purchase of crack cocaine from the defendant on the very day that the victim's body was discovered. In light of all of this evidence, I would have concluded, had the state not waived the issue, that the error was harmless beyond a reasonable doubt. See *State* v. *Artis*, 314 Conn. 131, 154, 101 A.3d 915 (2014) (setting forth harmless error standard when error is of constitutional magnitude).

## II

### PAROLEE STATUS AND REASONABLE EXPECTATION OF PRIVACY

The point I emphasize is a narrow one: whatever reasonable expectation of privacy in his home that the defendant had as a parolee, it did not *increase* as a result of his June 15, 2015 arrest and incarceration. I acknowledge that, during oral argument before this court, the state waived any claim that the July 15, 2015 warrantless search of the defendant's apartment was proper due to his status as a parolee at the time of his arrest on June 15, 2015. I also acknowledge that the state did not present any evidence in the trial court of the conditions of parole—either standard or specific—to which the defendant had agreed prior to his release to supervised parole on January 16, 2015. My starting point, however, is that, pursuant to the stipulation of the parties and as found by the trial court, when the defendant was arrested on June 15, 2015, he was "indisputably on supervised parole . . . ." Given that starting point, the *highest* reasonable expectation of privacy in his home *possibly* enjoyed by the defendant on July 15, 2015, was the same expectation that he had on June 15, 2015—not higher.

A brief factual and procedural background of the defendant's motions to suppress the two searches provides helpful context. The police and the defendant's parole officer conducted the first search of his apartment shortly after his arrest and incarceration, in the early morning hours of June 16, 2015. Gomes testified that the defendant's parole officer was "checking the residence for possible drug-related activity and contraband . . . ." The second search, on July 15, 2015, took place after Jenkins told the police that the defendant had told him that he had hidden the victim's cell phone and the crack he had stolen from her apartment in a hole in the wall in his bathroom. There is no indication in the record that the police were accompanied by a parole officer during the second search.

The defendant moved to suppress both searches, and the trial court denied both motions in an oral ruling on March 29, 2015, indicating that a memorandum of decision as to each ruling would follow. The court read its decision on its denial of the motion to suppress the first search into the record during the defendant's sentencing hearing on June 6, 2016. On the same day, the court issued its memorandum of decision as to its denial of the motion to suppress the second search.

As to the first search, notwithstanding his stipulation that the records of the Department of Correction reflected that he was on parole at the time of his arrest, the defendant argued that the parole board lacked jurisdiction over him. Specifically, the defendant argued that, because at that time he was subject to deportation to Haiti, he properly was under the jurisdiction of federal immigration authorities, rather than the parole board. Therefore, the defendant argued, the parole officer lacked authority to search his apartment and the evidence seized from that search should be suppressed. The trial court rejected the defendant's argument, beginning with the fact that there was no dispute that the defendant was on parole at the time of his arrest. The court explained further that "an individual can be under the jurisdiction of more than one entity simultaneously and that, therefore, being subject to the jurisdiction of one entity is not mutually exclusive [of] the jurisdiction of another, or second, entity." The court therefore concluded that the parole officer had authority to search the defendant's home and denied the motion to suppress. Implicit in the court's ruling was that the police officers had the authority to accompany the parole officer and assist in searching the apartment. As I have stated earlier in this concurring opinion, the defendant does not challenge the trial court's ruling regarding the first search in this appeal.

As to the second search, the defendant relied on the federal and state constitutions to argue that the search was unreasonable and the resulting evidence should be suppressed.[2] The defendant argued that the apartment

was his home, and that his incarceration had not changed that. The defendant argued that he had established that he retained a subjective expectation of privacy in the apartment and that his expectation was one that society would deem to be reasonable. In its opposition, the state confined its arguments to rebutting the defendant's claim that he had demonstrated that he held a subjective expectation of privacy in the apartment. Neither the defendant nor the state raised any issue regarding the defendant's parole status at the time of the second search.

The trial court denied the defendant's motion to suppress on the basis of its conclusion that the defendant had failed to demonstrate that he had a subjective expectation of privacy in the premises. See *State* v. *Hill*, 237 Conn. 81, 92, 675 A.2d 866 (1996). The court pointed to the following: the defendant had failed to contact the landlord about maintaining the lease, which was a month-to-month lease; he was in custody and had no income; he had testified that he knew he was going to be incarcerated for a very long time; he did not pay rent; and, he had failed to contact anyone about securing the personal possessions he had left in the apartment. The trial court declined to credit the defendant's testimony during the suppression hearing that he would return to the apartment if he could. Because the court concluded that the defendant had not demonstrated that he had a subjective expectation of privacy in the apartment, it did not reach the question of whether any expectation he had would be deemed reasonable by society. Finally, in light of its conclusion that the defendant had failed to make the required showing, the court relied on the landlord's consent to the search to conclude that the search was reasonable. Although the trial court referenced the defendant's parole status in its factual findings, it did not rely on that status in denying the motion to suppress.

"To determine whether a person has a reasonable expectation of privacy in an invaded place or seized effect, that person must satisfy the *Katz* test. See *Katz* v. *United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring). The *Katz* test has both a subjective and an objective prong: '(1) whether the [person contesting the search] manifested a subjective expectation of privacy with respect to [the invaded premises or seized property]; and (2) whether that expectation [is] one that society would consider reasonable. . . . This determination is made on a case-by-case basis. . . . The burden of proving the existence of a reasonable expectation of privacy rests [with] the defendant.' " *State* v. *Houghtaling*, 326 Conn. 330, 341, 163 A.3d 563 (2017), cert. denied,     U.S.    , 138 S. Ct. 1593, 200 L. Ed. 2d 776 (2018).

It is well established that parolees have a diminished expectation of privacy. The United States Supreme

Court has explained that "parolees are on the continuum of state-imposed punishments. . . . On this continuum, parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment. As this [c]ourt has pointed out, parole is an established variation on imprisonment of convicted criminals. . . . The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence. . . . In most cases, the [s]tate is willing to extend parole only because it is able to condition it upon compliance with certain requirements." (Citations omitted; internal quotation marks omitted.) *Samson* v. *California*, 547 U.S. 843, 850, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006).

"Although probationers and parolees are subject to a degree of impingement upon privacy that would not be constitutional if applied to the public at large . . . the law requires that such greater intrusions occur pursuant to a rule or regulation that itself satisfies the [f]ourth [a]mendment's reasonableness requirement . . . ." (Citations omitted; internal quotation marks omitted.) *United States* v. *Newton*, 369 F.3d 659, 665 (2d Cir.), cert. denied, 543 U.S. 947, 125 S. Ct. 371, 160 L. Ed. 2d 262 (2004). For this reason, the particular scope of a parolee's reasonable expectation of privacy depends on the conditions of parole. In *Samson*, the court held that a "condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the [f]ourth [a]mendment." *Samson* v. *California*, supra, 547 U.S. 847. In so holding, the court construed a California statute that required a prisoner eligible for parole to "agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." Cal. Penal Code § 3067 (a) (West 2000); see *Samson* v. *California*, supra, 846.

*Samson* involved standard conditions of parole as set forth by statute, but courts also have looked to the specific conditions set forth in the order granting the defendant parole or probation. For example, in *United States* v. *Robertson*, 239 F. Supp. 3d 426, 448 (D. Conn. 2017), appeal withdrawn, United States Court of Appeals, Docket No. 17-1845 (2d Cir. August 25, 2017), the court rejected the government's contention that the defendant's status on federal supervised release functioned as a forfeiture of "all his constitutional rights to the sanctity of his home." The court looked to the defendant's conditions of supervised release, which provided only that "[t]he defendant shall permit *a probation officer* to visit the defendant at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view *by the probation offi-*

*cer*." (Emphasis in original; internal quotation marks omitted.) Id. The court reasoned that the conditions of release did not extend to the police officers who were unaccompanied by a probation officer when they searched the defendant's apartment. Id., 449.

The relevant case law makes clear that the standard and specific conditions of the defendant's release would define the scope of the defendant's reasonable expectation of privacy in his home at the time of the first search, which occurred mere hours after his arrest. The record does not reflect what those conditions were.[3] Because the second search occurred after the defendant had been incarcerated for one month, in all likelihood he was no longer on parole when that search took place.

His conditions of parole, however, remain relevant for purposes of determining whether the July 15, 2015 search violated his reasonable expectation of privacy. As the United States Supreme Court has explained, with respect to one's reasonable expectation of privacy, parole is on a " 'continuum' " with the reasonable expectation of a law-abiding citizen at one end of the continuum and that of an inmate at the opposite end. *Samson* v. *California*, supra, 547 U.S. 850. Thus, although a parolee enjoys a " 'diminished' " expectation of privacy as compared to a law-abiding citizen, he has a greater expectation of privacy than that of an incarcerated individual. Id., 849–50. In other words, if the defendant's expectation of privacy changed when he was incarcerated, *that expectation certainly did not increase*. At the very best, the defendant's reasonable expectation of privacy in his home, following his incarceration, was the same expectation he enjoyed while on parole. Accordingly, if the July 15, 2015 search would have complied with the defendant's parole conditions at the time of his arrest—whatever those may have been—it did not constitute an invasion of his reasonable expectation of privacy. Of course, because the state did not create a record of what those conditions were, this court cannot determine whether the search comported with the conditions of parole.

For the foregoing reasons, I respectfully concur.

[1] "Zo" is the defendant's nickname.

[2] The police entered the defendant's apartment twice on July 15, 2015. The first time, they verified that Jenkins' information concerning the hole in the bathroom wall was correct by entering the bathroom and looking into the hole without removing the items within. After securing a search warrant, they returned and removed the items from the hole in the wall. The fact that the police obtained a search warrant before retrieving the items, however, is immaterial, as their admissibility stands or falls on the constitutional propriety of the initial search on July 15, 2015.

[3] The state appears to have had access to some records pertaining to the defendant's parole, but those records do not appear to have been introduced into evidence or marked for identification.