******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JEAN JACQUES
## (SC 20781)

McDonald, D'Auria, Mullins, Ecker, Alexander,
Dannehy and Bright, Js.*

*Syllabus*

Convicted, after a second trial, of murder in connection with the stabbing death of the victim, the defendant appealed to this court. The defendant was convicted of murder after his first trial, but this court reversed his conviction and remanded the case for a new trial on the ground that certain illegally obtained evidence had been improperly admitted. Prior to the defendant's second trial, defense counsel requested a second probable cause hearing, but the trial court denied that request. The trial court also denied the defendant's pretrial motion to exclude the testimony of a jailhouse informant, V, after making a threshold determination that V's purported testimony was reliable. At the defendant's second trial, the trial court permitted the state to introduce, as a prior inconsistent statement, the written statement of the defendant's former cellmate, J, which J had given to the police and which recounted certain inculpatory statements of the defendant. J had testified at the defendant's probable cause hearing and at his first trial but later suffered a stroke prior to the defendant's second trial that allegedly resulted in memory loss. Although J testified at the defendant's second trial, the defense claimed that his alleged memory loss rendered him functionally unavailable as a witness at the second trial. On appeal to this court, the defendant challenged the trial court's rulings on the request for a second probable cause hearing and the admission of J's statement to the police and V's testimony. *Held*:

The trial court did not violate the defendant's state constitutional right to a probable cause hearing by declining counsel's request for a second probable cause hearing after this court reversed the defendant's conviction and remanded the case for a second trial.

Neither the state constitution nor the statute (§ 54-46a) governing probable cause hearings requires a second probable cause hearing when an appellate

---

\* This case was originally argued before a panel of this court consisting of Chief Justice Robinson and Justices McDonald, D'Auria, Mullins, Ecker, Alexander and Dannehy. Thereafter, Chief Justice Robinson retired from this court and did not participate in the consideration of this case. In addition, Justice Bright was added to the panel and has read the briefs and appendices and listened to a recording of oral argument prior to participating in this decision.

The listing of justices reflects their seniority status on this court as of the date of oral argument.

court reverses a criminal conviction but does not dismiss the charge or charges that resulted in that conviction, the fact that a reviewing court determines that illegally obtained evidence should have been excluded at the defendant's trial has no impact on the earlier probable cause determination, and the defendant failed to demonstrate a jurisdictional defect that would render the first probable cause hearing invalid and entitle him to a second one.

The trial court did not violate the defendant's federal constitutional right to confrontation by admitting J's written statement to the police, that court having correctly determined that, despite J's alleged memory loss, J was available at the defendant's second trial for purposes of the defendant's right to confrontation.

After reviewing federal and Connecticut case law, this court concluded that J was available for cross-examination for purposes of any claimed violation of the defendant's right to confrontation because J appeared at the defendant's second trial, took an oath to testify truthfully, testified that he understood the oath, and answered all questions asked of him during cross-examination, during which defense counsel had the opportunity to ask J questions about his prior testimony, during the probable cause hearing and the first trial, regarding his written statement to the police.

The trial court did not abuse its discretion in admitting J's written statement to the police as a prior inconsistent statement under *State* v. *Whelan* (200 Conn. 743) and the corresponding provision (§ 8-5 (1)) of the Connecticut Code of Evidence.

J was available as a witness at the defendant's second trial, it was of no consequence that J could not explain the discrepancies between his written statement to the police and his testimony, insofar as a denial of recollection or a claim of memory loss can serve as the basis for a finding of inconsistency, and defense counsel effectively had conceded that a police officer had typed J's statement and that J had signed it, which satisfied the other elements for the admissibility of a prior inconsistent statement under *Whelan* and § 8-5 (1) of the Code of Evidence.

This court declined the defendant's requests to adopt a prophylactic rule under the state constitution, pursuant to which a witness would not be considered available for cross-examination if, due to a valid medical condition, the witness has no memory of the incident at issue or of making an out-of-court statement about the incident, and to exercise its supervisory authority to modify § 8-5 (1) of the Code of Evidence to preclude the admission of a prior inconsistent statement when a witness who made the prior statement has a medical condition that causes total memory loss.

The trial court did not abuse its discretion in making a prima facie determination that V's purported testimony was reliable and therefore admissible at the defendant's second trial.

The trial court considered the statutory (§§ 54-86o (a) and 54-86p (a)) factors that may be considered when making a prima facie determination that a jailhouse informant's testimony is reliable, and that court reasonably concluded that independent evidence corroborated specific details of V's testimony, there was no evidence establishing that those details were publicly available or that V had access to them while he was incarcerated, and the circumstances under which V initially provided information about the defendant to the police supported a finding of reliability.

Argued May 1, 2024—officially released August 26, 2025

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of New London and tried to the jury before *S. Murphy, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Pamela S. Nagy*, supervisory assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom were *Christa L. Baker*, senior assistant state's attorney, and, on the brief, *Paul J. Narducci*, state's attorney, and *Marissa Goldberg*, assistant state's attorney, for the appellee (state).

*Opinion*

DANNEHY, J. The defendant, Jean Jacques, appeals from the judgment of conviction, rendered after a jury trial, of one count of murder in violation of General Statutes § 53a-54a (a). On appeal, the defendant claims that the trial court (1) violated his state constitutional right to a probable cause hearing by denying his request for a second probable cause hearing after this court reversed his previous conviction and remanded the case for a new trial in *State* v. *Jacques*, 332 Conn. 271, 294, 210 A.3d 533 (2019), (2) violated his confrontation clause rights under the sixth amendment to the United States constitution, as well as abused its discretion, by admitting Tywan Jenkins' written statement to the

police as a prior inconsistent statement under *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), and (3) abused its discretion in finding that the state had made a prima facie showing that the testimony of Danny Vazquez, a jailhouse informant, was reliable and admissible under General Statutes § 54-86p. We affirm the judgment of conviction.

I

On the evening of June 14, 2015, Casey Chadwick and her boyfriend, Jean Joseph, were at their apartment in Norwich. At approximately 9 or 10 p.m., Joseph left the apartment and went to the home of Johane Jean Baptiste, the mother of Joseph's son, where he spent the night.[1] Around 11 p.m. that evening, Chadwick texted Joseph to tell him that the defendant was at their apartment. The defendant knew Chadwick and Joseph because he occasionally sold marijuana to them, and Joseph would also sometimes sell marijuana to the defendant.[2] Joseph responded to Chadwick and told her to ask the defendant to leave. Joseph also called the defendant and asked that he leave the apartment. The last outgoing message from Chadwick's cell phone was sent on the morning of June 15, 2015, at 12:20 a.m.

Later that morning, Joseph woke up, brought his son to day care, and attended a doctor's appointment. He also called and texted Chadwick multiple times to let her know when he would be back at the apartment and

---

[1] Joseph would occasionally spend the night at Baptiste's home so he could spend time with his son. Although Joseph did not intend to spend the night at Baptiste's that evening, he fell asleep on the couch with his son during his visit. Joseph remained there until the next morning, at which time he brought his son to day care and attended a doctor's appointment.

[2] Joseph indicated that he met the defendant through Chadwick. Joseph testified that Chadwick was friends with the defendant and that "he would stop by the house sometimes and just joke around, you know, and sit for like a good half hour, talk with us, and then just leave."

to apologize that he did not make it home the previous night. Chadwick did not pick up his calls or answer his text messages. Joseph returned to the apartment immediately after his doctor's appointment and found the apartment in disarray. Joseph later described the apartment as looking like someone had "ransacked" it. Chadwick was not present, and the marijuana that she and Joseph had purchased the day before,[3] as well as some narcotics that Joseph had stored in the kitchen, was missing.

Joseph began to panic when he could not find Chadwick. Fearing that their apartment had been raided by the police, and Chadwick arrested, Joseph called the police department and then the courthouse. Joseph learned nothing of Chadwick's whereabouts from these calls. Joseph also called a local bail bondsman to try to figure out what was going on, contacted Chadwick's friend to see if she had heard from Chadwick, and went to a neighbor's house to see if he had seen or heard anything. Unable to locate Chadwick or get in contact with her, Joseph returned to the apartment. Upon a further search of the apartment, Joseph discovered Chadwick's body inside of a closet, bloody and lifeless. Joseph called 911 to report what he had found, and the police and medical personnel were dispatched to the apartment.

Police officers responding to the call observed Chadwick's body in a seated, slumped over position in the closet with large lacerations to her neck area. A police officer at the scene testified that he detected a strong odor of cleaning supplies and observed a mop and bucket in the kitchen. The police did not find Chadwick's cell phone or any drugs during their search of the apartment.

---

[3] Joseph testified that he and Chadwick went to Mystic on June 14, 2015, where Chadwick purchased approximately four ounces of marijuana from her brother's friend.

An autopsy determined that Chadwick died as a result of numerous sharp force injuries to her head and neck that caused massive vascular damage and bleeding. She suffered four penetrating stab wounds and eleven lateral incised wounds to the head and neck; incised wounds to the right ring finger, left upper arm and left wrist; and six blunt force trauma injuries to the torso. Her right vertebral artery was damaged, and her right jugular vein and right carotid artery were "cut all the way through, severed."

The police learned from Joseph that Chadwick had texted him the night before to report that the defendant was in the apartment with her. Having reason to believe that the defendant was an active drug dealer, the police used a confidential informant to contact him on that same day to arrange a controlled purchase of cocaine.[4] When the arranged transaction was completed, the police arrested the defendant on a drug charge. At the time of his arrest, the police noticed blood on the defendant's shoes and cuts on his hands. Maura DeJoseph, the deputy chief medical examiner, examined the defendant's hands pursuant to a search warrant and opined that the cuts thereon appeared to be sharp force injuries that may have occurred within one or two days of her examination. DeJoseph opined that the cuts could have been caused by the defendant's hands slipping off the handle of a knife and down over the blade.[5]

---

[4] Police officers testified that the defendant was familiar to them because a confidential informant had previously named the defendant as a drug dealer in the downtown area of Norwich. An officer testified that they had attempted a controlled purchase with the defendant just four days before Chadwick's murder, but the defendant said he did not have drugs at that time.

[5] Mandi Edwards, a line cook at the Rustic Café in East Lyme, testified that the defendant cut his right hand on a broken plate while working at the restaurant on June 14, 2015, as a dishwasher. Merzilas Braboy, another restaurant employee who was working at the time, testified that the defendant "had broken a glass and cut his hand open." DeJoseph acknowledged that the cuts on the defendant's hands also could have been caused by a broken plate.

State police detectives searched the defendant's apartment pursuant to a valid search warrant. They discovered, among other things, a first aid kit on top of an ironing board and a white, rock like substance that appeared to be crack cocaine.[6] The police later obtained the defendant's pants from the car of a friend who had driven him to a laundromat early in the morning on June 15, 2015. The pants recovered by the police had blood stains on them.

Subsequent forensic testing indicated that the blood on the defendant's shoes and pants was consistent with Chadwick's DNA profile. Forensic testing also indicated that blood found on Chadwick's living room floor was consistent with the defendant's DNA profile. Blood found on Chadwick's kitchen wall came from a blood mixture that was consistent with her and the defendant's DNA profiles. The testing eliminated Joseph as a contributor to the blood found on the defendant's shoes and in Chadwick's apartment.

The state subsequently charged the defendant with one count of murder in violation of § 53a-54a (a). The defendant was first tried in 2016, and the jury found him guilty of murder. See *State* v. *Jacques*, supra, 332 Conn. 277. This court reversed that judgment of conviction and remanded the case for a new trial, concluding that the trial court improperly denied the defendant's motion to suppress evidence that the police had obtained during a warrantless search of the defendant's apartment. Id., 293–94.

---

[6] After receiving a tip from a confidential informant, the police later conducted a second search of the defendant's apartment, this time without a warrant. *State* v. *Jacques*, supra, 332 Conn. 275. Relying on the informant's statements, the officers located a hole in the wall of the defendant's bathroom, where they found Chadwick's cell phone and some drugs. In *Jacques*, we held that the trial court improperly denied the defendant's motion to suppress the evidence seized from this illegal search, and, accordingly, we remanded the case for a new trial. Id., 277–78, 294.

On remand, the trial court denied three pretrial motions that are relevant to the defendant's claims on appeal. First, the trial court denied the defendant's motion for a second probable cause hearing. Defense counsel argued that a second probable cause hearing was required because this court's reversal of the first judgment of conviction started the case "from scratch," thereby effectively resetting the defendant's right to such a hearing. Second, the trial court denied the defendant's motion to exclude the testimony of his former cellmate, Jenkins, who previously testified that the defendant admitted to him that he had killed Chadwick. The defendant claimed, among other things, that Jenkins had suffered a stroke sometime after the first trial, which rendered him unable to recall the alleged admissions made to him by the defendant. He argued that Jenkins was unavailable as a witness and that Jenkins' testimony did not fit within the hearsay exceptions set forth in the Code of Evidence. Third, the trial court denied the defendant's motion to exclude the testimony of Vazquez, another jailhouse informant. The defendant claimed that Vazquez' testimony was unreliable.

The defendant was tried again in 2022. The state presented a wide array of evidence, including inculpatory statements that were attributed to the defendant by Jenkins and Vazquez, which will be discussed in greater detail in this opinion. The defendant was again found guilty of murder, and the trial court sentenced him to sixty years of incarceration. This appeal followed.[7] Additional facts and procedural history will be set forth as necessary.

## II

We first consider the defendant's claim that the trial court violated his constitutional right to a probable

[7] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

cause hearing under article first, § 8, of the Connecticut constitution, as amended by article seventeen of the amendments, and General Statutes § 54-46a by denying his request for a second probable cause hearing after we reversed his previous conviction and remanded the case for a new trial.

In January, 2016, prior to the first trial, the trial court held a probable cause hearing pursuant to § 54-46a. The court found probable cause to believe that the defendant had murdered Chadwick based on "the exhibits, the autopsy report, the DNA report, all the photographs, and the totality of the testimony and the evidence submitted during the hearing . . . ." The defendant declined to make an offer of proof pursuant to § 54-46a (b). The defendant also did not challenge the trial court's probable cause finding.

At a hearing before the second trial, defense counsel requested a new probable cause hearing. Defense counsel argued that, although the defendant already had a probable cause hearing before the first trial, he was entitled to a second one because this court reversed his prior conviction. By implication, he argued, the reversal "starts [the case] from scratch," including the charges. The prosecutor disagreed, arguing that the defendant "is not entitled to an additional [probable cause] hearing" because, "[w]hile the trial starts from scratch, the case does not . . . ." The trial court agreed with the prosecutor, finding that the defendant already received a probable cause hearing. The trial court emphasized that the reversal was relative to one issue and that this court did not dismiss the defendant's charges.

On appeal, the defendant claims that, because the trial court relied on evidence at the probable cause hearing that we later held was improperly admitted at trial, § 54-46a required the trial court to grant the defendant a new probable cause hearing. The defendant

contends that the trial court's refusal to hold a second probable cause hearing warrants automatic reversal of his conviction. In response, the state argues that (1) the defendant's first probable cause hearing satisfied the statutory requirement, and (2) the defendant's argument lacks merit because the evidence improperly admitted at the first trial was nonetheless admissible at the probable cause hearing because the defendant was not entitled, under § 54-46a (b), to file a motion to suppress. We agree with the state.

Because the defendant's claim is premised on an alleged infringement of his constitutional rights, our review is plenary. See, e.g., *State* v. *Douglas C.*, 345 Conn. 421, 435, 285 A.3d 1067 (2022).

Article first, § 8, of the Connecticut constitution, as amended by article seventeen of the amendments, provides in relevant part that "[n]o person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law . . . ." In the 1983 legislative session, the legislature enacted § 54-46a "to institute the procedures necessary to implement article first, § 8, of the Connecticut constitution, as amended by article seventeen of the amendments . . . ." (Footnote omitted.) *State* v. *Kane*, 218 Conn. 151, 157, 588 A.2d 179 (1991).

A probable cause hearing held pursuant to § 54-46a is not only a constitutional right in Connecticut but "a jurisdictional prerequisite to continuing prosecution." *State* v. *Mitchell*, 200 Conn. 323, 332, 512 A.2d 140 (1986). Indeed, this provision "guarantees that no one will be forced to stand trial for a serious crime unless a court has first made a finding of probable cause at an open hearing in which the accused is provided with a full panoply of adversarial rights." Id., 330. We have emphasized that an "invalid finding of probable cause at [a

probable cause hearing] undermines the court's power to hear the case at trial." Id., 332. "We did not, in *Mitchell*, define precisely what defects would render a finding of probable cause 'invalid,' although implicit in our decision was an understanding that, at the very least, insufficiency of evidence presented at the probable cause hearing will deprive the trial court of jurisdiction . . . ." *State* v. *McPhail*, 213 Conn. 161, 170, 567 A.2d 812 (1989). In *McPhail*, we also concluded that a probable cause finding is invalid when "there has been a failure to disclose exculpatory evidence at a criminal defendant's probable cause hearing," but only if that failure to disclose "did in fact taint the defendant's subsequent prosecution." Id.; see also *State* v. *White*, 229 Conn. 125, 131, 136, 640 A.2d 572 (1994) (reversing defendants' convictions and remanding for new probable cause hearing because state failed to disclose exculpatory evidence that would have impeached testimony of state's only witness).

Although § 54-46a affords an accused with "a full panoply of adversarial rights"; *State* v. *Mitchell*, supra, 200 Conn. 330; we have made clear that "[a] probable cause hearing . . . was not designed to be a mini trial." (Internal quotation marks omitted.) *State* v. *Conn*, 234 Conn. 97, 110, 662 A.2d 68 (1995); see also *State* v. *Rollinson*, 203 Conn. 641, 649, 526 A.2d 1283 (1987) ("a hearing in probable cause is necessarily more limited in scope than a full trial on the merits"). That is precisely why § 54-46a (b) forbids the use of motions to suppress or for discovery in connection with such hearings. See *State* v. *Conn*, supra, 110.

In *State* v. *Kane*, supra, 218 Conn. 151, this court addressed a constitutional challenge to § 54-46a in which the defendant claimed that he was deprived of due process of law because "the statute precluded a motion to suppress at his probable cause hearing and consequently deprived him of the opportunity to sup-

press his allegedly involuntary statements to the police at that stage of the proceedings." Id., 155. We rejected that argument on the basis that the defendant had an adequate opportunity to later challenge the allegedly illegally obtained evidence during the course of his trial. Id., 159. Indeed, we said that, "as long as the defendant was afforded the opportunity to challenge the admissibility of his statements at trial, the adjudicatory phase of the proceeding against him, his right to due process was preserved." Id. We never suggested, however, that evidence that is later successfully challenged and excluded at trial would have any effect on the earlier probable cause determination or would otherwise require a new probable cause hearing. See id. (recognizing that "a damaging confession, which may later be suppressed at the trial level on the ground that it was involuntary and illegally obtained by the police, may be admitted at a preliminary hearing" (internal quotation marks omitted)).

The defendant does not contest that a probable cause hearing was held prior to his first trial. Nor does he challenge the trial court's finding of probable cause. Rather, the defendant essentially asks this court to hold that, because we reversed the defendant's first conviction on the ground that the trial court improperly had admitted illegally obtained evidence, a second hearing in probable cause is required. In making this argument, the defendant implies that our holding in *Jacques* imputed a jurisdictional defect to his first hearing in probable cause that entitles him to a second one. We find no legal support for the defendant's contention.

First, the defendant's argument confuses the scope of our decision in *Jacques* and the nature of § 54-46a hearings. In *Jacques*, we reversed the defendant's conviction and remanded the case for a new trial in which the illegally obtained evidence would be excluded; we did not dismiss the charges. See *State* v. *Jacques*, supra,

332 Conn. 294. Neither our state constitution nor § 54-46a requires a second probable cause hearing when this court reverses a criminal conviction.

Second, the fact that a court later determines that illegally obtained evidence should have been excluded at trial has no impact on the earlier probable cause determination. See, e.g., *State* v. *Kane*, supra, 218 Conn. 159. Accordingly, our holding in *Jacques* affected only the admissibility of the evidence at retrial—it did not impair or vacate the earlier probable cause determination.

Last, the defendant has not demonstrated that a jurisdictional defect exists that would render the first probable cause hearing invalid and entitle him to a second one. Notably, we have found no case in which we have required a new hearing in probable cause be held after we remanded the case for a new trial based on a trial court's erroneous admission of improperly obtained evidence. See, e.g., *State* v. *Oquendo*, 223 Conn. 635, 660–61, 613 A.2d 1300 (1992) (not requiring new probable cause hearing when trial court improperly admitted identification and evidence obtained from illegal seizure); *State* v. *Duntz*, 223 Conn. 207, 225, 613 A.2d 224 (1992) (not requiring new probable cause hearing when trial court improperly admitted evidence obtained by illegal search).

Because the defendant has already had a probable cause hearing and has not otherwise demonstrated a jurisdictional defect to the charges against him, we conclude that the trial court did not violate the defendant's constitutional rights by declining his request for a second hearing in probable cause.

### III

We turn next to the defendant's constitutional and evidentiary claims that stem from the trial court's

admission of Jenkins' written statement to the police
as a prior inconsistent statement under *Whelan*. The
defendant's primary claim is that the trial court violated
his sixth amendment right to confrontation under the
United States constitution by admitting Jenkins' state-
ment to the police because Jenkins' alleged medical
memory loss made him functionally unavailable at trial.[8]
Alternatively, the defendant claims that, regardless of
how this court decides the constitutional question, it
should hold that the trial court abused its discretion in
finding that Jenkins was available under *Whelan* because,
unlike the witness in *Whelan*, Jenkins (1) could not
explain the discrepancies between his prior statement
and his testimony, and (2) never acknowledged that he
signed the statement he made to the police. See *State*
v. *Whelan*, supra, 200 Conn. 746. The defendant further
invites this court either (1) to adopt a prophylactic rule
under our state constitution that provides that a witness
is not considered available for cross-examination if, due
to a valid medical condition, he has no memory of the
incident and of making an out-of-court statement about
the incident, or (2) to exercise our supervisory authority
to modify *Whelan* and Connecticut Code of Evidence
§ 8-5 to preclude their application to situations in which
a witness has a medical condition that causes total
memory loss and is not trying to thwart justice or feign
memory loss.

On July 23, 2015, Jenkins made a written statement
to the police. The statement detailed inculpatory state-

---

[8] The defendant specifically states that he is not claiming our state constitu-
tion provides a broader confrontation right than the federal constitution.
Rather, he argues that, if this court does not find a federal constitutional
violation, we should nevertheless adopt a prophylactic rule under our state
constitution in order to protect the right of confrontation thereunder, that
provides that a witness is not considered available for cross-examination
if, due to a valid medical condition, he has no memory of the incident and
of making an out-of-court statement about the incident. We address, but
ultimately reject, his request in part III C of this opinion.

ments that the defendant allegedly made to Jenkins while the two were cellmates at Corrigan Correctional Center (Corrigan). Jenkins stated that the defendant had asked him if he could help write a statement to explain the defendant's side of what happened to Chadwick. The defendant allegedly provided several versions of his account to Jenkins, the earlier versions pinning the death on a third party and the final version confessing that he had "snapped" and killed Chadwick, had tried to clean up the blood using a mop and bleach, had stolen Chadwick's phone and drugs, and had planned on selling the drugs to the contacts he would find in Chadwick's cell phone.

During both a January, 2016 probable cause hearing and the defendant's first murder trial, defense counsel cross-examined Jenkins regarding his statement to the police. The statement was not made a full exhibit at the probable cause hearing; it was made a full exhibit at the defendant's first trial, during the prosecutor's redirect examination of Jenkins, as a prior consistent statement. During both the probable cause hearing and the defendant's first trial, Jenkins testified that the defendant had confessed to killing Chadwick and that Jenkins later provided a statement to the police detailing the defendant's confession.

After the defendant's first trial and before testifying at the second trial, Jenkins suffered a stroke. Defense counsel moved to suppress Jenkins' testimony prior to the commencement of the second trial on the basis of Jenkins' memory loss due to the stroke, claiming that, "[d]ue to the fact that . . . Jenkins had a stroke, the change in circumstances, he is an unavailable witness and anything to replace him would be prejudicial." The trial court considered the issue and determined that questions about the nature and scope of the testimony would be addressed as the evidence came in.

When the prosecutor called Jenkins as a witness, defense counsel objected based on Jenkins' memory loss. The court proposed that the witness take the stand and that the court would "see where the testimony goes," "address any objections as soon as they're raised" and, if necessary, "take argument outside of the presence of the jury . . . ." Defense counsel agreed with the procedure. Jenkins walked into the courtroom, raised his right hand, and took an oath to tell the truth. On direct examination, Jenkins testified that he had received a subpoena from the state's attorney's office to testify and did not want to be in court. Jenkins recalled being incarcerated and being told that he had been convicted of a crime. Jenkins testified that he did not recall giving a statement to the police regarding information concerning Chadwick's murder. He acknowledged that he had suffered a stroke that caused memory loss and that the stroke occurred two or three years earlier. The prosecutor then offered Jenkins' 2015 statement to the police as a prior inconsistent statement under *Whelan* and § 8-5 of the Connecticut Code of Evidence.

Defense counsel objected to the admission of Jenkins' 2015 police statement, and the court heard arguments outside the presence of the jury. Defense counsel argued that admitting Jenkins' testimony would violate the defendant's sixth amendment right to confrontation under *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), describing Jenkins as having brain damage that is more than memory loss. Counsel further argued that the defendant lacked an opportunity to cross-examine Jenkins at the time Jenkins gave his statement to the police. In response, the prosecutor contended that, despite any memory loss, Jenkins was available because he was physically present and subject to cross-examination. The prosecutor further argued that, regardless of whether the defendant

was available, defense counsel already had an opportunity to cross-examine Jenkins at the probable cause hearing and at the first trial. Therefore, the prosecutor argued that admitting Jenkins' statement to the police did not violate the defendant's right to confrontation.

Defense counsel requested that the court canvass Jenkins to see if he understood the oath. The court instructed defense counsel that he was free to voir dire the witness. Counsel then asked Jenkins whether he knew what the oath was, and Jenkins responded in the affirmative. Counsel then asked Jenkins whether he knew that he could get in trouble if he did not follow the oath, to which Jenkins responded, "[y]es." Defense counsel asked no further questions and did not probe the nature of the stroke or the extent of Jenkins' memory loss. The court, relying on prior case law and the responses from Jenkins, including that Jenkins understood the oath and understood that he could get in trouble for not telling the truth, admitted the police statement into evidence. The court noted that, what it had seen was memory loss with respect to the statement and being incarcerated with the defendant, but that Jenkins was "adequately responding to the questions posed . . . ." The court ruled that Jenkins was not functionally unavailable.

During trial, defense counsel cross-examined Jenkins regarding his recollection of his statement to the police. Jenkins again affirmed that he had a stroke but understood that taking the oath required him to tell the truth. When asked questions about his prior statement to the police, Jenkins repeatedly answered, "I don't recall." He testified that he could not remember meeting the defendant, being cellmates with the defendant, hearing the defendant's alleged confession, or making a statement to the police about the defendant's alleged confession. But Jenkins remembered other details of his life. Jenkins said that, from what he understood, he had

been in jail fourteen or fifteen times for minor offenses and agreed that jail was not pleasant. Defense counsel gave Jenkins a copy of the statement, and Jenkins said that he could read and understand it. When counsel asked Jenkins if he was okay to turn to page two by himself, Jenkins said, "[y]eah . . . I'm not crazy. You talking to me like I'm crazy. . . . I forget a lot. . . . But I do understand." Jenkins read a portion of the statement and agreed that it said he was incarcerated. Jenkins then acknowledged that he had been incarcerated fourteen or fifteen times. When asked about whether he was incarcerated at the time of the statement, Jenkins said that he did not recall but all that he had been told was that he "was called a jailhouse snitch" and that he could not "see [his] grandchildren because it's dangerous." When asked if people would be upset if he made up information about people in prison to help himself, Jenkins said that he did not recall.

After the defendant was convicted, he filed a motion for a new trial and raised, among other issues, that the admission of Jenkins' 2015 police statement into evidence violated his sixth amendment right to confrontation. The trial court denied the motion and, in addressing the confrontation clause issue, specifically noted that it had the opportunity to observe Jenkins on the stand as well as his ability to testify. The court concluded that it stood by its findings, its reasoning, and the rulings on the record and that the admissibility of Jenkins' statement was not in violation of the defendant's constitutional rights under *Crawford* or in violation of *Whelan*.

## A

The defendant claims that the trial court violated his sixth amendment right to confrontation under the United States constitution because Jenkins' memory loss stemming from his stroke rendered him functionally unavailable and made it impossible to confront

Jenkins about his 2015 statement to the police. He acknowledges that, in *United States* v. *Owens*, 484 U.S. 554, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988), the United States Supreme Court held that a defendant's right to confrontation is not violated when an out-of-court identification by a witness is introduced into evidence and that witness has no memory at trial of the basis for the identification. See id., 559–60. He argues, however, that *Owens* does not control here because there is a significant difference between the facts of *Owens* and the facts of the present case, namely, that the witness in *Owens* could testify about the events leading up to the attack in that case; see id., 556; whereas Jenkins could not remember anything about the contents of his statement or that he ever gave a statement to the police. The defendant also argues that the facts of the present case are distinguishable from the facts of other cases in which this court rejected a defendant's claim that a witness was functionally unavailable for confrontation clause purposes. See *State* v. *Cameron M.*, 307 Conn. 504, 520–21, 55 A.3d 272 (2012) (overruled on other grounds by *State* v. *Elson*, 311 Conn. 726, 91 A.3d 862 (2014)), cert. denied, 569 U.S. 1005, 133 S. Ct. 2744, 186 L. Ed. 2d 194 (2013); *State* v. *Simpson*, 286 Conn. 634, 654, 945 A.2d 449 (2008); *State* v. *Pierre*, 277 Conn. 42, 84–85, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006). He argues that the relevant federal and state cases that have permitted the introduction of hearsay statements have addressed only situations in which a witness remembers either making a police statement or the events that gave rise to the statement.

The state contends that, although the defendant attempts to distinguish the facts of the present case from other cases in which courts have determined that a witness was available for purposes of the confrontation clause, the defendant ignores the fact that the sixth amendment guarantees only an opportunity to probe

and expose infirmities through cross-examination; it does not guarantee that cross-examination is effective in whatever way, and to whatever extent, the defense might wish. Because Jenkins took the witness stand, took an oath, and willingly answered all the questions put to him on cross-examination, the state contends that he was available for confrontation clause purposes. For the reasons discussed herein, we conclude that Jenkins was available for cross-examination and that the defendant's confrontation clause claim fails.

Although we generally "review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion"; (internal quotation marks omitted) *State* v. *Beavers*, 290 Conn. 386, 396, 963 A.2d 956 (2009); we have explained that "the abuse of discretion standard is at odds with the axiomatic principle that question[s] of constitutional law . . . [are] subject to plenary review." (Internal quotation marks omitted.) *State* v. *Lebrick*, 334 Conn. 492, 505, 223 A.3d 333 (2020). In *Lebrick*, we concluded that the question of availability under the sixth amendment confrontation clause is a mixed question of law and fact subject to plenary review. Id. Accordingly, the trial court's subordinate factual findings regarding the availability of a witness will not be disturbed unless they are clearly erroneous and the trial court's ultimate legal conclusion that a witness is constitutionally available, in light of the facts found, will be reviewed de novo. Id., 506.

The confrontation clause of the sixth amendment of the United States constitution affords "the accused" in "all criminal prosecutions" a right "to be confronted with the witnesses against him . . . ." U.S. Const., amend. VI.[9] In *Crawford* v. *Washington*, supra, 541 U.S.

---

[9] The sixth amendment right to confrontation is applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. E.g., *Pointer* v. *Texas*, 380 U.S. 400, 403, 406, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

36, the United States Supreme Court altered the approach to the confrontation clause that it had previously followed. See id., 68–69. After considering the historical underpinnings of the confrontation clause, the court overruled its decision in *Ohio* v. *Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), which had interpreted the confrontation clause to permit the admission of out-of-court statements by an unavailable witness so long as the statements "[bore] adequate indicia of reliability"; (internal quotation marks omitted) id., 66; and adopted a rule that hearsay labeled as "[t]estimonial" shall not be admitted into evidence unless the witness appears at trial for cross-examination or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination.[10] *Crawford* v. *Washington*, supra, 59, 68; see also *State* v. *Rivera*, 268 Conn. 351, 362, 844 A.2d 191 (2004) (explaining that *Crawford* overruled reliability approach set forth in *Roberts* for testimonial statements). Although *Crawford* left open many questions about how to define a testimonial statement, the decision did nothing to alter the court's prior jurisprudence on unavailability. See *Crawford* v. *Washington*, supra, 68. Indeed, nothing in the decision purported to overrule or call into question the pre-*Crawford* cases in which the court addressed memory loss in the confrontation clause context. It is those pre-*Crawford* cases that are pertinent to the question presented in the present case.

In *California* v. *Green*, 399 U.S. 149, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970), a sixteen year old declarant reported, in both a police interview and at a preliminary hearing, that the defendant was his marijuana supplier. Id., 151. At trial, however, the declarant claimed that he could not remember how he received the marijuana because he had taken LSD (lysergic acid diethylamide)

---

[10] The parties agree that Jenkins' 2015 statement to the police was testimonial.

on the day it was delivered. Id., 152. The prosecutor proceeded to introduce the declarant's statements from the preliminary hearing and the police interview. Id. The declarant admitted to making the prior statements and insisted that he had been telling the truth as he then believed it, but he also testified that he was telling the truth on the stand in claiming his inability to remember the actual events. Id.

The United States Supreme Court explained that "the [c]onfrontation [c]lause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." Id., 158. The court further explained that the confrontation clause "does not require excluding from evidence the prior statements of a witness who concedes making the statements, and who may be asked to defend or otherwise explain the inconsistency between his prior and his present version[s] of the events in question, thus opening himself to full cross-examination at trial as to both stories." Id., 164. The declarant's preliminary hearing testimony was deemed admissible, but the court declined to address whether the declarant's purported loss of memory so affected the defendant's right to cross-examination as to "make a critical difference" in the application of the confrontation clause because that issue was not yet ripe. Id., 168–69.

In a concurring opinion, Justice John Marshall Harlan II opined that "[t]he fact that the witness, though physically available, cannot recall either the underlying events that are the subject of an extra-judicial statement or previous testimony or recollect the circumstances under which the statement was given, does not have [s]ixth [a]mendment consequence. The prosecution has no less fulfilled its obligation simply because a witness has a lapse of memory. The witness is, in my view, available. To the extent that the witness is, in a practical

sense, unavailable for cross-examination on the relevant facts . . . I think confrontation is nonetheless satisfied." Id., 188–89 (Harlan, J., concurring).

Fifteen years after *Green*, the United States Supreme Court had the opportunity to consider whether admitting opinion testimony from a state's expert—"who was unable to recall the basis for his opinion"—violated the confrontation clause. *Delaware* v. *Fensterer*, 474 U.S. 15, 16, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985). In *Fensterer*, the defendant was convicted of murdering his fiancée. Id. To establish that a cat leash was the murder weapon, the state sought to prove that two hairs found on the leash were similar to the fiancée's hair, and that one of those hairs had been forcibly removed. Id. To prove that the hairs were forcibly removed, the state relied on the testimony of an agent with the Federal Bureau of Investigation (FBI). Id. The agent testified that one of the hairs was forcibly removed and explained that "there are three methods of determining that a hair has forcibly been removed . . . ." Id., 16–17. The agent, however, went on to say, "I have reviewed my notes, and I have no specific knowledge as to the particular way that I determined the hair was forcibly removed other than the fact that one of those hairs was forcibly removed." (Internal quotation marks omitted.) Id., 17. On cross-examination, the agent again was unable to remember which method he had employed to determine that the hair was forcibly removed. Id. The Delaware Supreme Court concluded that there was a confrontation clause violation because "[e]ffective cross-examination and discrediting of [the special agent's] opinion at a minimum required that he commit himself to the basis of his opinion." (Internal quotation marks omitted.) Id., 18.

The United States Supreme Court disagreed. It held that, in general, the confrontation clause "guarantees an *opportunity* for effective cross-examination, not cross-

examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original.) Id., 20. It explained that "[t]he [c]onfrontation [c]lause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the [c]onfrontation [c]lause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the [fact finder] the reasons for giving scant weight to the witness' testimony." Id., 21–22. The court noted that, in that case, defense counsel's cross-examination of the special agent "demonstrated to the jury that [he] could not even recall the theory on which his opinion was based" and that "the defense was able to suggest to the jury that [the special agent] had relied on a theory [that] the defense expert considered baseless." Id., 20. The court nevertheless indicated that it did not need to decide in that case "whether there are circumstances in which a witness' lapse of memory may so frustrate any opportunity for cross-examination that admission of the witness' direct testimony violates the [c]onfrontation [c]lause." Id.

Then came the United States Supreme Court's decision in *Owens*, which required it to squarely consider whether the confrontation clause barred testimony regarding a previous, out-of-court identification "when the identifying witness [was] unable, because of memory loss, to explain the basis for the identification." *United States* v. *Owens*, supra, 484 U.S. 555–56. There, a correctional counselor at a federal prison was beaten with a metal pipe, which resulted in injuries that severely impaired his memory. Id., 556. When the counselor first spoke with the FBI, he was unable to remember his attacker's name. Id. A few weeks later, in a second interview with the FBI, he was able to describe

the attack, name his attacker, and identify his attacker from an array of photographs. Id. At trial, the counselor recounted his activities just prior to the attack, described feeling blows to his head, and recalled seeing blood on the floor. Id. He also clearly remembered identifying the defendant as his assailant during the second interview. Id. On cross-examination, however, the counselor acknowledged that "he could not remember seeing his assailant" at the time of the assault. Id. And, "although there was evidence that he had received numerous visitors in the hospital," he could remember visits from only one of them; he "could not remember whether any of these visitors had suggested that [the defendant] was the assailant." Id. Although defense counsel "sought to refresh [the counselor's] recollection with hospital records, including one indicating that [he] had attributed the assault to someone other than [the defendant]," these attempts to refresh the counselor's recollection were unsuccessful. Id.

The United States Supreme Court concluded that the confrontation clause was not violated by the counselor's memory loss. Id., 559–60. It began by stating that it "has never held that a [c]onfrontation [c]lause violation" could be founded on the basis of a witness' loss of memory. Id., 557. After reviewing its decisions in *Green* and *Fensterer*, the court indicated that it "agree[d] with the answer suggested 18 years ago by Justice Harlan" in *Green*. Id., 559. The confrontation clause, the court stated, "guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original; internal quotation marks omitted.) Id. The opportunity for cross-examination, the court reasoned, "is not denied when a witness testifies as to his current belief but is unable to recollect the reason for that belief. It is sufficient that the defendant has the opportunity to bring out

such matters as the witness' bias, his lack of care and attentiveness, his poor eyesight, and even (what is often a prime objective of cross-examination . . . ) the very fact that he has a bad memory." (Citation omitted.) Id. The court recognized that "[t]he weapons available to impugn the witness' statement when memory loss is asserted will of course not always achieve success, but successful cross-examination is not the constitutional guarantee." Id., 560. The court explained, however, that, if a witness asserts memory loss, a defendant may still have "realistic weapons" to attack a witness' statement. Id. The court observed that defense counsel in that very case emphasized during summation the counselor's memory loss and "argued that [the counselor's] identification of [the defendant] was the result of the suggestions of people who visited him in the hospital." Id. The court concluded that, when the "declarant is present at trial and subject to unrestricted cross-examination," there was no need to evaluate the reliability of the prior out-of-court statement. Id.

Although *Green*, *Fensterer*, and *Owens* predated the United States Supreme Court's decision in *Crawford*, nothing in *Crawford*, as we have explained, explicitly overruled or called into question the vitality of these cases. See *State* v. *Pierre*, supra, 277 Conn. 82 (acknowledging that "*Crawford* neither overruled nor called into question its . . . earlier decisions that addressed and resolved [the memory loss] issue" (internal quotation marks omitted)). The defendant, however, points to footnote 9 in *Crawford*, which provides in relevant part that the confrontation clause "does not bar admission of a statement so long as the declarant is present at trial to defend or explain it," suggesting that a witness who has memory loss cannot "defend or explain" his statement and is therefore unavailable for confrontation clause purposes. *Crawford* v. *Washington*, supra, 541 U.S. 60 n.9. By focusing on this sentence in isolation,

the defendant fails to consider the statement in its full context. Immediately preceding that sentence is the unambiguous statement from the court that, "when the declarant appears for cross-examination at trial, the [c]onfrontation [c]lause places no constraints at all on the use of his prior testimonial statements." Id., citing *California* v. *Green*, supra, 399 U.S. 162. Since *Crawford*, the court has reiterated that a witness' "testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 309, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009). Although we recognize that the United States Supreme Court has not addressed what constitutes "availability" post-*Crawford*, there is nothing in *Crawford* that indicates that the court intended to overrule or alter its prior memory loss jurisprudence.

Since *Crawford*, virtually every court that has been confronted with a memory loss claim has followed the *Owens* approach and concluded that a declarant's appearance and subjection to cross-examination at trial is generally all that is necessary to pass muster under the confrontation clause. See, e.g., *United States* v. *Shaffers*, 22 F.4th 655, 661–62 (7th Cir. 2022) (rejecting defendant's argument that *Crawford* changed *Owens*' approach to cases of claimed memory loss and concluding "that the [c]onfrontation [c]lause is satisfied when the witness must look the accused in the eye in court; shortcomings in the declarant's memory may be made known to the jury" (internal quotation marks omitted)); *United States* v. *Bliss*, 188 Fed. Appx. 13, 16 (2d Cir.) ("because [the declarant] was available for cross-examination at trial, there was no [c]onfrontation [c]lause violation, notwithstanding [the defendant's] claim of loss of memory"), cert. denied sub nom. *Lott* v. *United States*, 549 U.S. 1026, 127 S. Ct. 570, 166 L. Ed. 2d 421

(2006); *Mercer* v. *United States*, 864 A.2d 110, 113, 114 n.4 (D.C. 2004) (holding that "the requirements of *Crawford* were met" when witness was "unable to recall in any meaningful way the events of the day of the shooting, her testimony before the grand jury, or her testimony in the first trial"), cert. denied, 543 U.S. 1188, 125 S. Ct. 1425, 161 L. Ed. 2d 191 (2005); see also *State* v. *Holliday*, 745 N.W.2d 556, 566–67 (Minn.) (citing cases), cert. denied, 555 U.S. 856, 129 S. Ct. 124, 172 L. Ed. 2d 95 (2008).[11] Indeed, this court said as much in *State* v. *Pierre*, supra, 277 Conn. 79. In *Pierre*, we addressed the issue of whether the admission of a witness' prior inconsistent written statement to the police violated the defendant's right to confrontation when the witness claimed at trial that he could not remember ever having heard any of the information recounted in the written statement, that he never had substantively reviewed the statement, and that he had signed the statement only to stop the police from harassing him. Id., 78–79. In other words, we had to determine whether a witness who testifies at trial and is subject to cross-examination is nevertheless "functionally unavailable" for purposes of the confrontation clause due to the witness' loss of memory. (Internal quotation marks omitted.) Id., 80.

In concluding that there was no confrontation clause violation, we relied on our previous *Whelan* jurisprudence and sister state decisions that had interpreted *Crawford*'s availability element; id., 81–84; holding that "a witness' claimed inability to remember earlier state-

---

[11] It appears that only one state supreme court, in interpreting its own constitution, has found that total memory loss of a witness can run afoul of its state constitution's confrontation clause. See *Goforth* v. *State*, 70 So. 3d 174, 183, 187 (Miss. 2011) ("[because] [a]rticle 3, [§] 26 of the Mississippi [c]onstitution provides defendants a constitutional right to confront the witnesses against them, we base our opinion on its provisions" and "find that, under the Mississippi [c]onstitution, [the defendant] did not have a constitutionally adequate opportunity to cross-examine [the witness] at trial or beforehand").

ments or the events surrounding those statements does not implicate the requirements of the confrontation clause under *Crawford*, so long as the witness appears at trial, takes an oath to testify truthfully, and answers the questions put to him or her during cross-examination." Id., 86. We agreed with the jurisdictions interpreting " 'availability for cross-examination' under *Crawford* as needing to be synthesized with the United States Supreme Court's holdings in [*Owens* and *Fensterer*] . . . ." (Citations omitted.) Id. We acknowledged that, "although 'availability' was not defined in *Crawford*, *Owens* and *Fensterer* [nevertheless] make clear that the right to cross-examination does not imply a right to cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Id. We therefore concluded that, because the witness "took the stand at trial, agreed to testify truthfully, was subject to cross-examination by the defendant, and answered all questions posed by defense counsel"; id., 84; there was no confrontation clause violation. Id., 86. We further explained that there was no confrontation clause violation because of the substance of the witness' testimony. See id., 85–86. In particular, we emphasized that the witness' testimony regarding details he could remember about his statement to the police "provided the defendant with the opportunity to show [the witness'] bias, interest, potential motives and demeanor as a witness." Id., 86.

Here, the trial court determined that Jenkins was available for cross-examination. Like the witness in *Pierre*, Jenkins appeared at trial, took an oath to testify truthfully, testified that he understood the oath and the implications of not telling the truth, and answered the questions put to him during cross-examination. See id. We need not decide, however, whether those facts alone, in the context of the facts of the present case, would be sufficient to establish availability for confron-

tation clause purposes, or whether the extent of Jenkins' memory loss is even relevant to that analysis, because the defendant also had the means to impugn the foundation of Jenkins' belief expressed in his prior statement.

Defense counsel, for example, could have cross-examined Jenkins regarding his prior testimony at the probable cause hearing and the first trial, and could have sought to admit any portions of that testimony that were inconsistent with Jenkins' asserted lack of memory at the second trial. See Conn. Code Evid. § 8-5 (1); see also part III B of this opinion. With that prior testimony, defense counsel could have established, among other things, that (1) Jenkins had difficulty communicating with the defendant due to the defendant's thick Haitian accent and his nonlinear thinking, (2) Jenkins lied to the defendant about the existence of forensic evidence implicating the defendant in the crime "[t]o see if [the defendant] had really [done] it," (3) the defendant told Jenkins "seven or eight" different versions of what happened, but the written statement provided "[t]he best one," and (4) the written statement did not include all of the information that Jenkins had conveyed to the police about his conversations with the defendant.

Defense counsel also could have highlighted during cross-examination that Jenkins not only did not want to testify at the trial but also did not like being labeled a jailhouse snitch, which calls into question the extent of his memory loss and his motive for testifying; emphasized that, based on Jenkins' limited memory and because he did not personally write the statement, Jenkins could not say at the time of the second trial whether the police had completely fabricated the information; pointed to key details Jenkins previously testified to knowing but had left out of his statement; and argued that the police statement was as unreliable as Jenkins' memory argua-

bly was. Moreover, the trial court instructed the jury on the heightened scrutiny required when evaluating jailhouse informant testimony—an additional layer that was absent in *Pierre*. Simply put, defense counsel was not without tools to probe Jenkins' lack of memory or to try to cast doubt on his earlier statement to the police. See, e.g., *State* v. *Pierre*, supra, 277 Conn. 81 ("defense counsel was not without resources" in cross-examining witness (internal quotation marks omitted)); see also *United States* v. *Owens*, supra, 484 U.S. 560 (explaining that defendants may have "realistic weapons" to attack witness' statement when memory loss is asserted).

On this factual record, we conclude that the trial court correctly determined that Jenkins was available for confrontation clause purposes because (1) Jenkins appeared at trial, took an oath to testify truthfully, and answered all the questions put to him during cross-examination, and (2) defense counsel had tools available to cross-examine Jenkins, namely, the opportunity to ask Jenkins questions about his prior testimony regarding his statement to the police. Like the United States Supreme Court in *Green*, *Fensterer*, and *Owens*, we do not need to address in the present case whether there may be circumstances in which a witness, because of the nature and extent of a medical condition and its impact on memory, is unavailable for confrontation clause purposes. Although trial courts should, when requested, hold a pretrial evidentiary hearing to consider medical evidence that may establish that a valid medical condition so frustrates the opportunity for cross-examination that the witness is functionally unavailable, this is not such a case.

## B

The defendant next claims that, even if the admission of Jenkins' statement did not violate his sixth amend-

ment rights, the trial court nevertheless abused its discretion in admitting Jenkins' statement under *Whelan* and § 8-5 of the Connecticut Code of Evidence. We disagree.

It is well known that this court "review[s] the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Smith*, 289 Conn. 598, 617, 960 A.2d 993 (2008). "We will make every reasonable presumption in favor of upholding the trial court's ruling . . . ." (Internal quotation marks omitted.) *State* v. *Qayyum*, 344 Conn. 302, 315, 279 A.3d 172 (2022).

In *State* v. *Whelan*, supra, 200 Conn. 743, we held that the substantive use of a prior written inconsistent statement is permitted, provided that the statement has been "signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination." Id., 753. This rule has been codified at § 8-5 of the Connecticut Code of Evidence.[12] It is well settled that "changes in position," "denial[s] of recollection," and "omissions" can satisfy the inconsistency element of *Whelan*. (Emphasis omitted; internal quotation marks omitted.) *State* v. *Simpson*, supra, 286 Conn. 649; see also *State* v. *Whelan*, supra, 748–49 n.4. For a prior inconsistent statement to be admitted under *Whelan* and § 8-5, however, the declarant must be available to testify at trial and be subject to cross-examination. E.g., *State* v. *Whelan*, supra, 750–53.

[12] Section 8-5 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule, provided the declarant is available for cross-examination at trial:

"(1) Prior inconsistent statement. A prior inconsistent statement of a witness, provided (A) the statement is in writing or otherwise recorded by audiotape, videotape or some other equally reliable medium, (B) the writing or recording is duly authenticated as that of the witness, and (C) the witness has personal knowledge of the contents of the statement. . . ."

In part III A of this opinion, we concluded that the trial court had correctly determined that Jenkins was available for cross-examination at trial for purposes of the confrontation clause. For the same reasons, we conclude that Jenkins was also available for purposes of *Whelan* and § 8-5 of the Connecticut Code of Evidence.[13] The defendant nevertheless argues that two of the other requirements of *Whelan* and § 8-5 were not satisfied. Specifically, he argues that Jenkins (1) could not explain the discrepancies between his prior statement and his testimony, and (2) never acknowledged that he signed the statement he made to the police. These arguments are unavailing.[14]

First, although the defendant contends that Jenkins could not explain the discrepancies between his prior statement and his testimony, the defendant concedes that *Whelan* plainly states that a denial of recollection or a claim of memory loss can serve as the basis for a finding of inconsistency. See id., 748 n.4. Therefore, the

---

[13] We note that the defendant argues that Jenkins was unavailable under both *Crawford* and *Whelan*. Although this could be construed as suggesting that availability under *Crawford* and *Whelan* differs, the defendant did not make this argument before the trial court and does not explain on appeal how a defendant can be "available" for purposes of *Crawford* and the confrontation clause but nevertheless be "unavailable" for purposes of *Whelan*. As such, we need not decide whether there may ever be a circumstance involving medical memory loss in which the definition of "availability" for purposes of *Whelan* is not coterminous with the meaning of "availability" under *Crawford*.

[14] On appeal, the defendant notes that he does not claim that the trial court abused its discretion on the ground that Jenkins' genuine lack of memory was not inconsistent with his prior statement under *Whelan* because he did not raise such a claim before the trial court. Nevertheless, we note that we have expressly rejected any distinction between feigned and genuine memory loss under *Whelan*. See, e.g., *State* v. *Cameron M.*, supra, 307 Conn. 527 (rejecting proposition that "whether the *Whelan* rule should be limited to feigned loss of memory, rather than the genuine loss of memory experienced by the victim . . . remains an open question"). Although the defendant has asked us to invoke our supervisory authority to modify *Whelan* and § 8-5 of the Connecticut Code of Evidence; see part III D of this opinion; he has not asked that we overrule *Cameron M.*

fact that Jenkins was not able to explain the discrepancies due to his memory loss did not preclude admission of the statement under *Whelan*. Second, although counsel raised an objection to Jenkins' availability under *Whelan* and the confrontation clause, he represented to the court that Detective Anthony Gomes of the Norwich Police Department had typed up the statement, that Gomes had given it to Jenkins, and that Jenkins had signed it, effectively conceding those points. Because all of the requirements of *Whelan* and § 8-5 of the Connecticut Code of Evidence were satisfied, we conclude that the trial court did not abuse its discretion in admitting Jenkins' statement.

## C

In the alternative, the defendant asks that we adopt a state constitutional prophylactic rule that provides that a witness is not considered available for cross-examination if, due to a valid medical condition, he has no memory of the incident or of making an out-of-court statement about the incident. The defendant contends that, because medical memory loss would prevent a defendant from obtaining any meaningful information from the witness during cross-examination, a jury could not accurately determine the witness' credibility. Thus, the defendant argues that applying the prophylactic rule in such situations would "prevent the significant risk of a constitutional violation . . . ."[15] (Citation omitted;

[15] The defendant does not argue that the confrontation clause in article first, § 8, of our state constitution provides any greater protection than the confrontation clause of the federal constitution. See *State* v. *Lockhart*, 298 Conn. 537, 555, 4 A.3d 1176 (2010) ("[W]ith respect to the right to confrontation within article first, § 8, of our state constitution, its language is nearly identical to the confrontation clause in the sixth amendment to the United States constitution. The provisions have a shared genesis in the common law."). Rather, the defendant is asking this court to craft a prophylactic rule that arguably provides greater protection than what the state constitution requires. The defendant and the state address this request under the six factors that we set forth in *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992). The *Geisler* analysis, however, "applies to cases in which the state constitution has no federal analogue, as well as those in which the

internal quotation marks omitted.) *State* v. *Purcell*, 331 Conn. 318, 342, 203 A.3d 542 (2019).

"We begin our analysis with a brief discussion of the nature of constitutional prophylactic rules and the distinction between such rules and ordinary case-by-case judicial review of constitutional claims. This court has recognized that 'courts have the duty not only to craft remedies for actual constitutional violations, but also to craft prophylactic constitutional rules to prevent the significant risk of a constitutional violation.' . . . *State* v. *Dickson*, 322 Conn. 410, 426 n.11, 141 A.3d 810 (2016), cert. denied, 582 U.S. 922, 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017); see, e.g., C. Rogers, 'Putting Meat on Constitutional Bones: The Authority of State Courts To Craft Constitutional Prophylactic Rules Under the Federal Constitution,' 98 B.U. L. Rev. 541, 545 (2018) (former Chief Justice of Connecticut Supreme Court explaining nature, scope, and purpose of court's power to adopt prophylactic rules). Prophylactic rules 'are [forward-looking] and [have the potential to] either sanction future government conduct that is not expressly prohibited by the applicable constitutional provision or require future government conduct that the constitutional provision does not expressly mandate . . . .' C.

claim is that the state constitution provides greater protection than does the federal constitution." (Internal quotation marks omitted.) *State* v. *Jose A. B.*, 342 Conn. 489, 508, 270 A.3d 656 (2022). We have previously recognized that it may not be necessary to consider the *Geisler* factors in deciding whether to adopt a prophylactic rule because the analytical process in deciding whether to adopt such a rule necessarily involves a policy centered weighing process. See *State* v. *Purcell*, 331 Conn. 318, 343 n.16, 203 A.3d 542 (2019); see also *State* v. *Haynes*, 352 Conn. 236, 246 n.6, 336 A.3d 1139 (2025) (policy centered weighing process is embedded in *Geisler* analysis as sixth factor). In the present case, we focus on the sixth *Geisler* factor and ask whether a judicially created rule or an additional layer of prophylaxis, rather than a case-by-case analysis, is necessary to protect the constitutional right. We note, however, that the result, based on a consideration of all of the *Geisler* factors, for the reasons articulated in part III A of this opinion, would be the same.

Rogers, supra, 547. Because constitutional prophylactic rules have this potential to prohibit or to mandate what the constitution does not, their adoption is justified only when the risk of a constitutional violation is high, i.e., when the constitutional protections are 'not by their terms readily applicable in the field' . . . id., 553; or when case-by-case analysis by the courts is inadequate due to the lack of 'judicially manageable standards.' Id., 554. Thus, 'the authority . . . to create prophylactic rules is not without limits. To the contrary, there is general agreement that [courts] should use this authority cautiously and rules should be as narrowly tailored as possible to accomplish their purpose.' Id., 565." *State v. Andres C.*, 349 Conn. 300, 328–29, 315 A.3d 1014, cert. denied,     U.S.    , 145 S. Ct. 602, 220 L. Ed. 2d 236 (2024).

With this general background in mind, we turn to the defendant's claim that we should adopt a prophylactic rule that witnesses who have medical memory loss are unavailable if, due to that memory loss, they cannot remember making the out-of-court statement or the circumstances surrounding the statement. Although we recognize that a witness' memory loss can pose real challenges and can conceivably result in a constitutional violation under certain circumstances, we are not persuaded that the risks, as articulated by the defendant in his brief, warrant the adoption of a categorical prophylactic rule for which the defendant advocates, especially when it is not clear that such a rule would accomplish what a case-by-case analysis could not.

First, we note that neither the United States Supreme Court nor this court has ever drawn a distinction based on the reason for the memory loss, as the defendant does in the present case. Rather, both courts have suggested that memory loss, whether genuine or feigned, medical or otherwise, is an issue of credibility and weight for the jury. See, e.g., *Bullcoming* v. *New Mexico*,

564 U.S. 647, 661–62 n.7, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011) (suggesting that there is no confrontation clause violation when analyst who cannot remember performing particular test is placed under oath and is subject to cross-examination by defense counsel); *State v. Pierre*, supra, 277 Conn. 85 ("[d]efense counsel was presented with, and used, plenty of ammunition to attack [declarant's] credibility and truthfulness on cross-examination" (internal quotation marks omitted)); see also *United States* v. *Keeter*, 130 F.3d 297, 302 (7th Cir. 1997) (explaining that confrontation clause does not distinguish between genuine and feigned memory loss and that confrontation clause is satisfied when witness "look[s] the accused in the eye in court"), cert. denied sub nom. *Ahrens* v. *United States*, 523 U.S. 1034, 118 S. Ct. 1331, 140 L. Ed 2d 492 (1998); 30 C. Wright & D. Blinka, Federal Practice and Procedure (Supp. 2025) § 6446, p. 24 ("[w]hether the memory loss appears genuine (e.g., a head injury) or feigned (e.g., friends helping friends), the issue is one of credibility that is left for the jury").

Second, even if it is proper to single out memory loss stemming from a medical condition from other types of memory loss, it is not clear to us what the defendant means by the phrase "valid medical condition" in advancing his proposed rule. Although memory loss stemming from a stroke may fall within his proposed rule, would the nature of the stroke not be relevant? Would memory loss stemming from old age fall under the rule? What if the witness claims that he has poor memory or a lack of memory because he previously hit his head? The questions that remain are numerous, and the line drawing required is difficult. The proposed rule neither provides clear guidance nor is it aimed at government misconduct. See C. Rogers, supra, 98 B.U. L. Rev. 553–54 ("[b]y providing clear guidelines for official conduct, 'prophylactic rules build a fence around the [c]onstitu-

tion' ''). We are therefore not confident that the rule for which the defendant advocates is sufficiently tailored to ameliorate the alleged risk of constitutional violations. Rather than craft a rule that may be overinclusive or underinclusive, we think the better approach is to allow trial courts, on a case-by-case basis, to determine whether a valid medical condition so frustrates the opportunity for cross-examination that the witness is functionally unavailable.

In short, although we are cognizant that memory loss and forgetfulness can raise complex problems in the courtroom, we are not persuaded that it is necessary or appropriate at this time to adopt the defendant's proposed rule.

D

The defendant makes a final request. He asks that we exercise our supervisory authority to modify Connecticut Code of Evidence § 8-5 to preclude its application to situations in which a witness has a medical condition that causes total memory loss. The defendant argues that, when a witness has medical memory loss to the extent that he cannot remember making the out-of-court statement or the circumstances surrounding the statement, there is no basis to determine that the lack of memory constitutes an inconsistency under Connecticut Code of Evidence § 8-5.

The state argues that we should decline to exercise our supervisory authority because the defendant's proposed modification to the Code of Evidence is a matter of substantive law rather than judicial procedure. The state further argues that the rule is unnecessary because trial judges are best situated to evaluate whether a prior statement is inconsistent with contemporaneous testimony. Finally, the state argues that "the record is inadequate to demonstrate that Jenkins . . . is a diminished witness . . . ."

We have emphasized that our "[s]upervisory authority is an extraordinary remedy that should be used sparingly . . . ." (Internal quotation marks omitted.) *In re Aisjaha N.*, 343 Conn. 709, 724, 275 A.3d 1181 (2022). "Although [a]ppellate courts possess an inherent supervisory authority over the administration of justice . . . [that] authority . . . is not a form of free-floating justice, untethered to legal principle. . . . Our supervisory powers are not a last bastion of hope for every untenable appeal. They are an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, [although] not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Constitutional, statutory and procedural limitations are generally adequate to protect the rights of the [litigant] and the integrity of the judicial system. Our supervisory powers are invoked only in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts." (Emphasis in original; internal quotation marks omitted.) *State* v. *Wade*, 297 Conn. 262, 296, 998 A.2d 1114 (2010). Overall, "the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers." (Internal quotation marks omitted.) *State* v. *Anderson*, 255 Conn. 425, 439, 773 A.2d 287 (2001). Thus, we are more likely to invoke our supervisory powers when there is a "pervasive and significant problem"; *State* v. *Hill*, 307 Conn. 689, 706, 59 A.3d 196 (2013); or when the conduct or violation at issue is "offensive to the sound administration of justice . . . ." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 239–40, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

Even assuming that the rule the defendant requests that we adopt falls within the ambit of our supervisory

powers, we respectfully decline the defendant's invitation to adopt such a rule. The defendant does not argue that the traditional protection afforded when a trial judge exercises his or her discretion to determine whether medical memory loss constitutes a basis for finding inconsistency is "inadequate to ensure the fair and just administration of the courts." (Internal quotation marks omitted.) *State* v. *Wade*, supra, 297 Conn. 296. We do not rule out that there may be circumstances in which, due to the nature and extent of a witness' medical memory loss, the trial court in the exercise of its considerable discretion concludes that the witness' prior statement is not admissible under *Whelan*, either because the statement is not inconsistent with the witness' testimony or because the witness is unavailable for cross-examination.[16] "Whether there are inconsistencies between the two statements is properly a matter for the trial court. . . . Inconsistencies may be shown not only by contradictory statements but also by omissions. In determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined. . . . Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . and the same principle governs the case of the forgetful witness. . . . A statement's inconsistency may be determined from the circumstances and is not limited to cases in which diametrically opposed assertions have been made. Thus, inconsistencies may be found in changes in position and they may also be found in denial of recollection." (Emphasis omitted; internal quotation marks omitted.)

---

[16] As previously noted, the defendant has failed to preserve any claim that Jenkins' lack of memory was not inconsistent with his prior statement under *Whelan*. See footnote 14 of this opinion. Accordingly, we need not—and do not—decide whether there may ever be a circumstance in which a witness' medical condition and its effect on memory may render a statement not inconsistent for purposes of *Whelan*.

*State* v. *Simpson*, supra, 286 Conn. 649. Thus, the concerns raised by the defendant are adequately addressed under the present analytical framework of the *Whelan* rule, and he has not demonstrated, and our research has not revealed, that trial judges are improperly (and frequently) admitting evidence based on inconsistency when the witness has total memory loss, so as to call it a problem that is "pervasive and significant," warranting this court's intervention. (Internal quotation marks omitted.) *In re Aisjaha N.*, supra, 343 Conn. 725. For these reasons, we decline the defendant's invitation to exercise our supervisory authority.

## IV

Finally, we turn to the defendant's claim that the trial court abused its discretion in finding that the state made a prima facie showing that the testimony of Vazquez, a jailhouse informant, was reliable under § 54-86p.

In February, 2021, Vazquez sent a letter to the state's attorney's office offering to provide information regarding the defendant if the state would "help" him. Vazquez sent the letter while incarcerated and after having been sentenced to fifteen years of imprisonment for multiple felony counts. The state subsequently contacted Vazquez to gather more information and then decided to call him as a witness at the defendant's trial. Once the defendant learned that the state would present Vazquez as a witness, the defendant requested a reliability hearing pursuant to § 54-86p and moved to exclude Vazquez' testimony on the ground that it was unreliable under the statutory factors.

Based on Vazquez' testimony at the reliability hearing, the trial court found the following facts. "[T]he defendant was a cellmate . . . [with] Vazquez" and was "housed in the same unit or pod at Corrigan" during the "late summer, early fall of 2019," although Vazquez later stated that he was not certain of the year. Vazquez

had not heard Chadwick's name prior to speaking with the defendant. Vazquez spent time with the defendant while they were in the same unit, where "the defendant admitted to him that he killed . . . Chadwick." The defendant also told Vazquez that the state found "blood on his shoelaces or sneakers, that he tried to clean up some blood with a mop . . . that . . . he had put a cell phone in a wall in the bathroom and that the police said that they located it by pinging a location of the phone." Vazquez also testified that the defendant told him that he had removed the SIM card from Chadwick's cell phone to evade police detection and that another person named "P.K." was present the night of the incident.

The trial court further found that Vazquez had contacted the state's attorney's office voluntarily. He did not speak with "the police department or the state's attorney's office prior to writing the letter." The court noted that Vazquez had never testified as an informant but had contacted authorities on other matters in the past, and he is an official " 'source of information' for the Department of Correction . . . ." The court explained that "Vazquez receive[d] no benefit for being a source of information" other than "picking a cellmate." The court acknowledged that, although Vazquez hoped to receive a reduced sentence in exchange for his testimony, "[n]o promises ha[d] been made to Vazquez in exchange for his testimony . . . ."

During the reliability hearing, the defendant chose not to testify or present witnesses after Vazquez' testimony. The trial court nevertheless gave the defendant an opportunity to submit a supplemental brief to further address the admissibility of Vazquez' testimony. In his memorandum of law in support of his motion to exclude Vazquez' testimony, the defendant claimed that Vazquez' testimony was not reliable and, accordingly, was inadmissible pursuant to § 54-86p. He primarily argued

that the information Vazquez provided was vague and already public knowledge. He also argued that the Department of Correction's records indicated that the defendant and Vazquez did not overlap as prisoners at Corrigan during the summer of 2019, when the defendant allegedly confessed to Vazquez.

The trial court denied the defendant's motion to exclude Vazquez' testimony, finding that it was reliable. The court stated that it had considered each factor set forth in § 54-86p and emphasized several specific factual findings to support its finding of reliability. First, the court noted that Vazquez reached out to the state "without having first been contacted by authorities . . . ." Second, the court found it significant that the information that Vazquez provided was "consistent with the investigation and corroborated other key evidence." In particular, the court emphasized that Vazquez mentioned that the defendant had told him that Chadwick's cell phone was missing a "SIM card," reasoning that this was likely not public information. Third, the court explained that Vazquez provided the information "without a witness' cooperation agreement or any other benefit or promise provided in exchange for his testimony . . . ." Fourth, the court noted that the statements were obtained when the defendant and Vazquez were imprisoned in the same unit at Corrigan, even though Vazquez was "vague" about the "specific date(s) . . . ." Finally, the court was not made aware of an instance in which Vazquez had recanted proposed testimony or provided "jailhouse testimony against other defendants." Accordingly, the trial court concluded that, "[i]n accordance with the testimony and exhibits submitted at the hearing, the consideration of [the defendant's] memorandum [of law in support of his motion], and the statutory factors set forth in [General Statutes] §§ 54-86o and 54-86p, the court finds that the state has met its burden

of proving the reliability of . . . Vazquez' testimony and makes a threshold determination of reliability."

The defendant claims that the trial court abused its discretion because it was unreasonable for the court to find that Vazquez' testimony was reliable under § 54-86p. The defendant primarily argues that Vazquez provided vague information about details that were already public knowledge, inaccurate information about the SIM card, and that the trial court ignored that Vazquez had a strong incentive to testify against the defendant.[17] The state disagrees, arguing that the defendant failed to show a clear abuse of discretion and that the trial court acted reasonably in making its threshold determination of reliability. We agree with the state.

It is well established that we will overturn a "trial court's ruling on evidentiary matters . . . only upon a showing of a clear abuse of the court's discretion." (Internal quotation marks omitted.) *State* v. *Mark T.*, 339 Conn. 225, 232, 260 A.3d 402 (2021). We "make every reasonable presumption in favor of upholding the

---

[17] The defendant also argues in his reply brief that "the trial court failed to give adequate consideration to the factors that weighed against the reliability of Vazquez' testimony . . . ." Although not explicitly argued, the defendant appears to argue that, because the trial court did not analyze each factor individually, it did not adequately consider them. Rather than set forth its analysis factor by factor, the trial court generally concluded that, "[a]fter careful consideration of the factors set forth in the statute, the court hereby finds that the state" met its burden under § 54-86p. The trial court's analysis was not improper in this respect. Neither § 54-86p nor our case law requires the trial court to expressly discuss each § 54-86p factor individually. See General Statutes § 54-86p (a) (providing that trial courts "*may* consider the [enumerated] factors" (emphasis added)); *State* v. *Bember*, 349 Conn. 417, 443, 316 A.3d 297 (2024) (§ 54-86p "does not provide that any one of the enumerated factors is dispositive or that any are mandatory considerations"). Rather, it is sufficient that the trial court *considered* the statutory factors. Absent evidence to the contrary, we "[presume] that the trial court properly applied the law"; *Dur-A-Flex, Inc.* v. *Dy*, 349 Conn. 513, 533 n.6, 321 A.3d 295 (2024); especially in light of the court's express acknowledgment that it carefully considered "the factors set forth in the statute . . . ."

trial court's rulings, considering only whether the court reasonably could have concluded as it did." *State* v. *Annulli*, 309 Conn. 482, 491, 71 A.3d 530 (2013). "The issue, therefore, is not whether we would reach the same conclusion in the exercise of our own judgment, but only whether the trial court acted reasonably." *State* v. *Deleon*, 230 Conn. 351, 363, 645 A.2d 518 (1994).

The legislature has set forth a nonexhaustive list of factors that the trial court "may consider" when making a prima facie determination that a jailhouse informant's testimony is reliable. General Statutes § 54-86p (a). These factors include "(1) [t]he extent to which the . . . testimony is confirmed by other evidence; (2) [t]he specificity of the testimony; (3) [t]he extent to which the testimony contains details known only by the perpetrator of the alleged offense; (4) [t]he extent to which the details of the testimony could be obtained from a source other than the defendant; and (5) [t]he circumstances under which the jailhouse witness initially provided information supporting such testimony to . . . [the] [p]olice . . . including whether the jailhouse witness was responding to a leading question." General Statutes § 54-86p (a). "Importantly, the statute does not provide that any one of the enumerated factors is dispositive or that any are mandatory considerations." *State* v. *Bember*, 349 Conn. 417, 443, 316 A.3d 297 (2024).

When considering the factors enumerated in § 54-86p (a), a court can consider "information . . . disclosed pursuant to . . . subsection (a) of section 54-86o . . . ." General Statutes § 54-86p (a). This includes (1) information about a jailhouse witness' criminal history, (2) the existence of a jailhouse witness cooperation agreement, (3) details about "any statement allegedly given by the defendant to a jailhouse witness," (4) whether the witness has previously "recanted any testimony subject to the disclosure," and (5) "[i]nformation concerning any other criminal prosecution in which the

jailhouse witness testified, or offered to testify . . . .'' General Statutes § 54-86o (a).

Here, the trial court reasonably concluded that, consistent with § 54-86p (a), independent evidence corroborated specific details of Vazquez' testimony. Specifically, Vazquez testified that the defendant told him that the police had found blood on his shoes or shoelaces and a mop at the crime scene, and that the defendant sought to remove the SIM card to prevent the police from tracking the cell phone's location. Police testimony and exhibits introduced at trial confirmed these details. The details were specific, and it is unlikely that a source other than the defendant and the police would have known them.

The defendant unpersuasively challenges the reasonableness of these findings. In his brief, the defendant primarily emphasizes that all the details, besides the SIM card, were publicly available, in which case, it is immaterial that they were corroborated. Nothing in Vazquez' testimony or the record, however, supports a conclusion that the other facts were publicly available. Indeed, the defendant did not present evidence that established that these details were publicly available or that Vazquez had access to that information while incarcerated. See, e.g., *State* v. *Little*, 194 Conn. 665, 673, 485 A.2d 913 (1984) ("[a]ny inferences drawn [by the trier of fact] must be rational and founded upon the evidence").

The defendant further argues that the details about the SIM card are factually incorrect because the police report indicated that the "SD card," not the SIM card, was missing from Chadwick's cell phone. The defendant contends that the trial court "presumably relied on this information when making its finding[s] . . . ." The trial court, however, reasonably could have inferred that the defendant mistakenly thought he had removed the SIM

card but actually had removed the SD card. See, e.g., *State* v. *Mark T.*, supra, 339 Conn. 232. The trial court also reasonably could have inferred that the defendant thought that the SD card was the SIM card. In either case, the trial court could have reasonably concluded that this information supported its conclusion that Vazquez' testimony was reliable.

The defendant also argues that the trial court could not have reasonably concluded that the circumstances under which Vazquez provided the information to the state's attorney's office were reliable. He claims that in situations, as here, in which a jailhouse informant writes a letter explicitly offering to provide information about the defendant in exchange for the state's "help" shortly after receiving a fifteen year sentence, a trial court cannot conclude that the informant's testimony is reliable. We have emphasized, however, that "the expectation of a [r]eward for testifying is a systemic reality . . . even [when] the informant has not received an explicit promise of a reward." (Citation omitted; internal quotation marks omitted.) *State* v. *Arroyo*, 292 Conn. 558, 568, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010); see also id., 569 (highlighting that "several commentators have pointed out that jailhouse informants frequently have motives to testify falsely that may have nothing to do with the expectation of receiving benefits from the government"). Furthermore, the trial court considered other aspects of Vazquez' testimony and information provided under § 54-86o. Specifically, the trial court highlighted that Vazquez' initial letter to the state was unprompted, that he testified without a witness cooperation agreement, and that he had not otherwise recanted proposed testimony in other criminal proceedings or previously testified as a jailhouse informant. Based on this information, the court could have reason-

ably concluded that the circumstances under which Vazquez' statement was given were reliable.

Even if this court came out differently on the question of whether the circumstances under which Vazquez gave his statement supported a finding of reliability, we cannot, on this record, conclude that the trial court's overall finding of reliability was a clear abuse of discretion. Whether the circumstances under which Vazquez initially provided information to the state support a finding of reliability implicates one statutory factor. But no single factor is "dispositive or . . . mandatory . . . ." *State* v. *Bember*, supra, 349 Conn. 443. Because the trial court's factual findings were otherwise reasonable, we conclude that the trial court did not abuse its discretion in finding that the state had made a prima facie showing that Vazquez' testimony was reliable and, therefore, admissible at trial after consideration of all of the factors enumerated in §§ 54-86o and 54-86p.

The judgment is affirmed.

In this opinion the other justices concurred.